United States Court of Appeals,

Fifth Circuit.

No. 94-50552.

Margo NEFF, for herself and those similarly situated, Plaintiff-Appellant,

v.

AMERICAN DAIRY QUEEN CORPORATION, Defendant-Appellee.

July 20, 1995.

Appeal from the United States District Court for the Western District of Texas.

Before REAVLEY, GARWOOD and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Margo Neff appeals from the district court's entry of summary judgment on her claims against American Dairy Queen Corporation ("ADQ") under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (West Supp.1995) ("ADA").  We affirm.

I

ADQ owns the federally registered "Dairy Queen" trade name and various trademarks and service marks used in connection with the operation of licensed Dairy Queen stores.  ADQ, through franchise agreements with franchisees throughout the United States, licenses franchisees to establish and operate Dairy Queen retail stores.  Among those franchisees is R & S Dairy Queens, Inc., a Texas corporation that owns two Dairy Queen stores in San Antonio, one located at 13122 Nacogdoches (the "Nacogdoches Store"), and the other located at 9726 Perrin Beitel (the "Perrin Beitel Store") (collectively, the "San Antonio Stores").

1

Margo Neff is disabled and requires a wheelchair to gain mobility. Neff filed suit under section 308 of the ADA, 42 U.S.C. § 12188(a) (1988), alleging that ADQ had violated section 302 of the ADA, 42 U.S.C. § 12182, by failing to make the San Antonio Stores accessible to her.[1] In her complaint, Neff pointed to numerous barriers that she alleged made the San Antonio Stores inaccessible to the disabled. Neff sought an injunction requiring ADQ to modify "its"[2] San Antonio Stores to eliminate the alleged barriers, a declaratory judgment concerning ADQ's violation of the ADA, and attorneys' fees.[3]

ADQ moved for summary judgment on the grounds that it did not own, lease, or operate the San Antonio Stores and therefore was not responsible for removing the alleged barriers. Its summary judgment pleadings included an affidavit by ADQ's Vice President for Franchise Operations stating that ADQ neither owned nor

---

[1]Section 302(a) provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Section 302(b)(2)(A)(iv) further provides that such discrimination includes the "failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, ... where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv).

[2]In her complaint, Neff alleged that ADQ "owns" the San Antonio Stores.

[3]Neff also sought certification of a class of disabled consumers who were unable to access the San Antonio Stores. Neff later filed a motion for class certification, which the district court denied as moot when it granted ADQ's motion for summary judgment. Neff makes no argument regarding class certification on appeal.

operated the San Antonio Stores. ADQ also offered copies of the franchise agreements between ADQ and R & S Dairy Queens relating to the San Antonio Stores. According to ADQ, the agreements established as a matter of law that it did not "operate" the stores within the meaning of section 302.

In response, Neff contended that the terms of the franchise agreement between ADQ and R & S Dairy Queens regarding the Nacogdoches Store supported her claim that ADQ retained sufficient control over the operation of the San Antonio Stores to make it an "operator" of the stores for the purposes of section 302.

The district court granted summary judgment, *see Neff v. American Dairy Queen, Inc.*, 879 F.Supp. 57 (W.D.Tex.1994), concluding that the Nacogdoches Store franchise agreement established no more than that ADQ held the power to veto modifications to the store's facilities, and that this amount of control was insufficient to bring ADQ within the scope of section 302. Neff appeals from the district court's entry of summary judgment, contending that the existence of genuine issues of material fact regarding whether ADQ "operates" the San Antonio Stores should have precluded summary judgment on her ADA claims.[4]

## II

We review a district court's grant of summary judgment de novo, applying the same standard as did the district court.

---

[4]The United States has filed an amicus curiae brief supporting Neff's position, and the International Franchise Association has filed an amicus curiae brief supporting ADQ's position.

*McDaniel v. Anheuser-Busch, Inc.,* 987 F.2d 298, 301 (5th Cir.1993). We "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986). Summary judgment is appropriate when the summary judgment record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Fraire v. City of Arlington,* 957 F.2d 1268, 1273 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank,* 47 F.3d 1459, 1462 (5th Cir.1995), *petition for cert. filed,* 63 U.S.L.W. 3892 (U.S. June 12, 1995) (No. 94-2025).

A

Neff argues that summary judgment was inappropriate in this case because genuine issues of material fact exist regarding ADQ's control over the restaurants in question. This argument raises the question of whether the issue that Neff and ADQ dispute is one of fact or one of law.[5] The only issue in dispute between the parties is whether ADQ's contractual rights under the Nacogdoches Store

---

[5]The United States specifically argues that the question is one of fact.

4

franchise agreement demonstrate that ADQ "operates" the San Antonio Stores. Neff's only summary judgment evidence, and the only basis for her claim that ADQ "operates" the San Antonio Stores, is the Nacogdoches Store franchise agreement, and "[t]he interpretation of an unambiguous contract is a question of law" which we review de novo. *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.,* 40 F.3d 1474, 1481 (5th Cir.1995). Neff has not alleged that the Nacogdoches Store franchise agreement is ambiguous. Indeed, the parties do not dispute the *meaning* of the terms of the agreement at all; rather, they dispute whether the control provided for in the agreement makes ADQ an "operator" of the store for the purposes of section 302, again a question of law which we review de novo. *See Matagorda County v. Russell Law,* 19 F.3d 215, 217 (5th Cir.1994) ("We review the district court's legal decisions, including the proper interpretation of a statute, *de novo.*"). Consequently, we hold that because the disputed issue in this case is purely legal, it was appropriately resolved through summary judgment.[6]

---

[6]In support of her argument that the existence of genuine issues of material fact should have precluded the district court from rendering summary judgment, Neff cites *Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781 (3d Cir.1978). In *Drexel,* the Third Circuit applied the Rule 56(c) summary judgment standard to an issue of state agency law that involved an interpretation of a franchise agreement. A wrongful death plaintiff contended that the franchisor exercised sufficient control over the franchisee retail store such that it "operated" the store, thus rendering the franchisor potentially liable for the torts of its franchisee. The court treated the question of whether the franchise agreement created an agency relationship as one of fact and interpreted the agreement in the light most favorable to the nonmovant. *See id.* at 788-89. Although the court's reasoning is not entirely clear, the court did hold that the franchise agreement was ambiguous, *id.* at 788, raising the factual issue of what the parties intended it to mean, *id.* In

Neff's appeal thus presents a narrowly defined issue of first impression: whether a franchisor with limited control over a franchisee's store "operates a place of public accommodation" within the meaning of section 302(a).[7] Section 302(a) provides in pertinent part that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of ... [the] facilities ... or accommodations of any place of public accommodation *by any person who owns, leases (or leases to),[8] or operates a place of public accommodation.*" (emphasis added). Because the ADA does not define the term "operates," we "construe it in accord with its ordinary and natural meaning." *Smith v. United States,* --- U.S. ----, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993); *see also Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

---

any event, to the extent that *Drexel* is inconsistent with our holding in this case, we decline to follow its reasoning.

Neff also cites two state cases in support of her argument that material facts precluded summary judgment: *Singleton v. International Dairy Queen, Inc.,* 332 A.2d 160 (Del.Super.Ct.1975), and *American Dairy Queen Corp. v. Taxation & Revenue Department,* 93 N.M. 743, 605 P.2d 251 (Ct.App.1979). Neither case relates to ADA liability or applies the federal standard for summary judgment, however, and we decline to follow them.

[7]The parties do not dispute that the San Antonio Stores are places of public accommodation.

[8]*The parties agree that ADQ does not own the premises in question or lease them to R & S Dairy Queens.*

meaning."). To "operate," in the context of a business operation, means "to put or keep in operation," *The Random House College Dictionary* 931 (Rev. ed. 1980), "[t]o control or direct the functioning of," *Webster's II: New Riverside University Dictionary* 823 (1988), "[t]o conduct the affairs of; manage," *The American Heritage Dictionary* 1268 (3d ed. 1992).

Neff argues that the terms of the Nacogdoches Store Franchise Agreement demonstrate that ADQ exercises sufficient control over the San Antonio Stores to bring ADQ within the scope of section 302. We hold that the relevant inquiry in a case such as this one is whether ADQ specifically controls the modification of the franchises to improve their accessibility to the disabled. *Cf. Carparts Distribution Center, Inc. v. Automotive Wholesalers' Ass'n,* 37 F.3d 12, 16-18 (1st Cir.1994) (interpreting "employer" as used in Title I of ADA by looking to defendant's control over allegedly discriminatory denial of employee benefits). Although we have found no circuit court of appeals case law interpreting the scope of "operates" as used in § 302 of the ADA, the existing district court authority is consistent with our approach. All three district courts that have addressed the question of ADQ's liability for allegedly discriminatory conditions at franchisee stores have concluded that ADQ does not "operate" the stores for the purposes of § 302, and all three looked to ADQ's authority over structural modifications to the franchisee stores in reaching their conclusions. *See Young v. American Dairy Queen, Inc.,* 1994 WL 761233, *2 (N.D.Tex.1994); Neff v. American Dairy Queen, Inc.,* 879

7

F.Supp. 57, 60 (W.D.Tex.1994); *Alonzo v. Bayside Restaurant Co.,* C.A. No. C-94-103, slip op. at 4 (S.D.Tex.1994).[9]

Neff and the United States point to numerous non-structural aspects of the San Antonio Stores' operations that they contend ADQ controls, such as accounting, personnel uniforms, use of trademarks, etc. While ADQ's control over these aspects may be relevant in other contexts, we hold that because it does not relate to the allegedly discriminatory conditions at the San Antonio Stores, it does not bear on the question of whether ADQ "operates" the franchises for the purposes of the ADA's prohibition on discrimination in public accommodations. Instead, the relevant question in this case is whether ADQ, according to the terms of its franchise agreements with R & S Dairy Queens, controls modification of the San Antonio Stores to cause them to comply with the ADA.

Neff points to the following language in the Nacogdoches Store franchise agreement to support her position that ADQ controls the

---

[9]In addition, two district courts have interpreted "operates" in the context of hospital operations consistently with our approach to the question in the context of franchise store operations. In *Howe v. Hull,* 873 F.Supp. 72 (N.D.Ohio 1994), the court held that a physician "operated" a hospital because he exercised sole discretion over the allegedly discriminatory decision not to admit a patient with AIDS. The court specifically focused on the physician's authority over the allegedly discriminatory act. *Id.* at 77-78. In *Aikins v. St. Helena Hosp.,* 843 F.Supp. 1329 (N.D.Cal.1994), the court held that a physician who worked at a hospital as an independent contractor did not "operate" the hospital in question. The plaintiff in *Aikins,* the deaf wife of an emergency room patient, complained that the hospital had discriminated against her by failing to provide her with an interpreter. The court held that the physician defendant did not "operate" the hospital because, as an independent contractor, he exercised no authority over the hospital's policy on the use of interpreters. *Id.* at 1335.

San Antonio stores:[10]

> B. Company makes available to its licensees a system to establish, equip and operate a retail store facility as part of the "Dairy Queen" system using distinctive, uniform and approved designs, equipment, supplies ... which Licensee desires to adopt and use to operate a "Dairy Queen" retail store ... in accordance with this Agreement and the system standards and requirements established and periodically revised by the Company....

> 5.1 The retail Store shall be constructed and equipped in accordance with Company's approved specifications and standards in effect at the time pertaining to design and layout of the building, and as to equipment, inventory, signage, fixtures, location and design and accessory features. Licensee shall not commence construction of the Store until he has received the written consent of Company to his building plans.

> 5.2 Any replacement, reconstruction, addition or modification in building, interior or exterior decor or image, equipment or signage, to be made after Company's consent is granted for initial plans, whether at the request of Licensee or of Company, shall be made in accordance with written specifications which have received the prior written consent of Company, which shall not be unreasonably withheld.

> 5.3 The building, equipment and signage employed in the conduct of Licensee's business shall be maintained in accordance with requirements established periodically by Company, or reasonable, specific lists prepared by Company based upon periodic inspections of the premises by Company's representatives. Within a period of ninety (90) days after the receipt of any particular maintenance list, Licensee shall effect the items of maintenance designated therein including the repair of defective items and/or the replacement of unrepairable or obsolete items of equipment and signage. Routine maintenance shall be conducted in accordance with general schedules published by Company.

> 6.7 Licensee shall adopt and use as his continuing operational routine the standard "Dairy Queen" management system, as

---

[10]Neff has not identified, either below or on appeal, any language in the Perrin Beitel Store franchise agreement to support her claim that ADQ "operates" the Perrin Beitel Store. The Perrin Beitel Store franchise agreement is more limited in scope than the Nacogdoches Store agreement, and it contains none of the provisions to which Neff points in support of her argument regarding ADQ's control over the Nacogdoches Store.

prescribed in the Store Management Operations Manual, including Company's standards with respect to product preparation, merchandising, employee training, equipment and facility maintenance and sanitation. Company will revise the Manual and these programs periodically to meet changing conditions of retail operation in the best interest of "Dairy Queen" retail stores.....

Record on Appeal, vol. 1, at 183-86. However, we agree with the district court that this language does not establish sufficient control on ADQ's part such that ADQ can be said to "operate" the San Antonio stores. Paragraph B is simply a general statement regarding the purpose of the agreement, and even it makes clear that R & S Dairy Queen, not ADQ, will "operate" the store. Paragraph 5.1 provides for the greatest level of control over the accessibility of the Nacogdoches Store to the disabled, but it relates to the construction of the store, and it is undisputed that the Nacogdoches store was constructed and equipped before the ADA was enacted. Consequently, even if ADQ "operated" the store with respect to its construction, such operation is irrelevant because the issue in Neff's case is whether ADQ "operates" the San Antonio Stores with respect to the removal of existing architectural barriers. In addition, ADQ's pre-ADA control over the San Antonio Stores cannot form the basis of Neff's discrimination claim because the ADA is not to be given retroactive effect. *See Burfield v. Brown, Moore & Flint, Inc.,* 51 F.3d 583, 588 (5th Cir.1995) (holding that employment discrimination claim was barred because "[t]he ADA is not retroactive and it does not apply to actions allegedly taken prior to the effective date of the Act").

Paragraph 5.2, the only paragraph that relates to

10

modifications to the structure of the Nacogdoches Store, simply provides that ADQ may disapprove any proposed modifications to the Nacogdoches Store building and equipment. While this does amount to a limited form of control over structural modifications, we agree with the district court that this right, which is essentially negative in character, cannot support a holding that ADQ "operates" the Nacogdoches Store with respect to its removal of architectural barriers to the disabled. We note that Neff has not alleged or offered any summary judgment evidence to show that ADQ has withheld its consent to proposed modifications to the Nacogdoches Store designed to bring it into compliance with the ADA.

In its brief, Neff specifically emphasizes paragraphs 5.3 and 6.7. Paragraph 5.3 refers to building and equipment maintenance and not the modification of the store structure or removal of architectural barriers. ADQ's control in this regard, while more relevant than its control over employee uniforms, accounting standards, etc., is not directly relevant to the Neff's suit. Neff's complaint is not based on R & S's failure to perform maintenance on the Nacogdoches Store building or equipment; rather, she complains of the equipment itself. Further, while Paragraph 5.3 does provide that such maintenance must be conducted in accordance with ADQ-established maintenance lists, Neff has not alleged, or offered any summary judgment evidence to show, that these lists prevent R & S from modifying the Nacogdoches Store to bring it into compliance with the ADA.

Paragraph 6.7 states that R & S must adhere to the routine

11

prescribed by ADQ's "Store Management Operations Manual," through which ADQ sets standards for "product preparation, merchandising, employee training, equipment and facility maintenance and sanitation." The effect of this provision is similar in kind to the effect of Paragraph 5.3. It does not relate to the modification of the physical structure or accessibility of the Nacogdoches Store, and Neff has not alleged or offered summary judgment to show that the Store Management Operations Manual prevents R & S Dairy Queens from making such modifications.[11]

In sum, while the terms of the Nacogdoches Store franchise agreement demonstrate that ADQ retains the right to set standards for building and equipment maintenance and to "veto" proposed structural changes, we hold that this supervisory authority, without more, is insufficient to support a holding that ADQ "operates," in the ordinary and natural meaning of that term, the Nacogdoches Store.[12]

---

[11]At oral argument, Neff also pointed to paragraphs 11.1 and 11.2 of the agreement, which allow ADQ to terminate the agreement in case of breach. The right to terminate, however, does not grant ADQ additional control over the modification of the Nacogdoches Store to increase its accessibility to the disabled beyond ADQ's underlying contractual rights with respect to such modifications.

[12]We note that a recent Second Circuit case may suggest a disagreement with our reasoning. In *Staron v. McDonald's Corp.,* 51 F.3d 353 (2d Cir.1995), the court addressed the question of whether a ban on smoking was a "reasonable accommodation" required by the ADA. *See* 42 U.S.C. § 12182(b)(2)(A)(ii). In that case, the plaintiffs sued McDonald's Corporation and Burger King Corporation alleging that the two corporations' policies of permitting smoking in "their" restaurants violated the ADA. The plaintiffs sought an injunction requiring the defendants to "establish a policy of prohibiting smoking in all of the facilities they own, lease or operate." *Staron,* 51 F.3d at 355.

12

Because Neff rested her claim that ADQ "operates" the San Antonio stores exclusively on the terms of the Nacogdoches Store franchise agreement, and did not allege that ADQ has prevented R & S Dairy Queens from complying with the ADA, either as a practical matter or by exercising its rights under its franchise agreements,[13] we hold that ADQ met its burden under Rule 56(c) in its motion for summary judgment. ADQ established the absence of a genuine issue of material fact and further that it was entitled to judgment as a matter of law based on the terms of its franchise agreements with R & S Dairy Queens. Because Neff offered no summary judgment evidence other than the Nacogdoches Store franchise agreement in response to ADQ's motion, we further hold that Neff's summary judgment evidence was insufficient to raise a genuine issue for

---

In its opinion, the Second Circuit alludes to an earlier disposition of a motion by McDonald's Corporation:

> On the same day that the district court granted the motions to dismiss, McDonald's announced a new policy prohibiting smoking in all of its corporate owned-and-operated restaurants. The smoking ban did not extend to its franchised restaurants. McDonald's then submitted a motion to this court to dismiss plaintiffs' appeal as moot. This court denied the motion on June 21, 1994.

> *Id.* However, the court did not state on what grounds McDonald's policy change did not render the case moot, and the court's opinion contains no further discussion regarding the propriety of holding McDonald's responsible for the smoking policy at the franchisee restaurants.

[13]As we noted above, Neff does not contend that ADQ has prevented R & S Dairy Queens from removing architectural barriers by refusing to approve modifications to the restaurants or promulgating a policy preventing such modifications. Indeed, ADQ offered numerous exhibits documenting its efforts to encourage franchisees to comply with the ADA.

trial.

Neff and the United States argue that to exclude ADQ from the scope of section 302(a) would be inconsistent with the canon of construction requiring courts to interpret civil rights statutes liberally to effectuate their remedial purposes. *See, e.g., Gates v. Collier,* 616 F.2d 1268, 1275 (5th Cir.1980) (liberally interpreting Civil Rights Attorneys' Fee Awards Act), *rehearing granted in part on other grounds,* 636 F.2d 942 (5th Cir.1981); *United States v. DeRosier,* 473 F.2d 749, 751 (5th Cir.1973) (liberally interpreting Civil Rights Act of 1964). Even assuming the canon applies in this context, we hold that Neff's interpretation of the term "operates" would require more than just a liberal construction of that term. Neff's argument in this case would require us to bend "operates" too far beyond its natural meaning for us to rely on the canon of statutory interpretation requiring that we interpret civil rights legislation liberally.[14]

Furthermore, we fail to see how our interpretation of "operates" to exclude ADQ under the circumstances involved in this case will interfere with the remedial purposes of the ADA. Assuming conditions at the San Antonio stores do not comply with the ADA, it is Neff's decision not to sue the owner and operator of those stores, R & S Dairy Queens, that will prevent her from

---

[14]*Cf. EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1281-82 (7th Cir.1995) ("We do not doubt that the employment discrimination statutes have broad remedial purposes and should be interpreted liberally, but that cannot trump the narrow, focused conclusion we draw from the structure and logic of the statute. A liberal construction does not mean one that flies in the face of the structure of the statute.").

14

obtaining the injunction she seeks.[15]

Neff also argues that because "a franchisor is held responsible under the Civil Rights Act, a franchisor is held responsible under the ADA." This argument fails on several levels. First, it depends on Neff's premise that "the Title III [of the ADA] rights and remedies are the same as those rights and remedies available under the Civil Rights Act of 1964." However, the statutory provision Neff cites for this proposition states only that the *remedies* available under the ADA shall be the same as the

_____

[15]Because Neff seeks only injunctive relief, it is curious why Neff elected to name ADQ rather than R & S Dairy Queens, the more logical defendant to an ADA suit over the accessibility of the San Antonio Stores. However, the answer may lie in §§ 302(b)(2)(A)(iv) and 301(9)(C) of the ADA, 42 U.S.C. §§ 12182(b)(2)(A)(iv), 12181(9)(C). Section 302(b)(2)(A)(iv) defines discrimination in public accommodations to include "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, ... where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). Section 301(9)(C), in turn, defines "readily achievable" as follows:

> The term "readily achievable" means easily accomplishable and able to be carried out without much difficulty or expense. In determining whether an action is readily achievable, factors to be considered include—

> (B) the overall financial resources of the covered entity....

42 U.S.C. § 12181(9)(C). Consequently, the scope of the injunctive relief available to Neff if she proves a violation of the ADA will depend in part on the financial strength of the defendant against which she proceeds.

Still, while our holding excluding ADQ from the scope of § 302 with respect to the San Antonio Stores may limit the actual relief available to Neff, it will not hurt her ability to compel R & S Dairy Queens to make "readily available" structural changes to the San Antonio stores.

15

*remedies* available under the Civil Rights Act. *See* 42 U.S.C. § 12188(a)(1). Second, because the Civil Rights Act does not define the scope of defendants who may potentially be liable with reference to who "operates" a public accommodation, Civil Rights Act cases are unlikely to be informative on the meaning of that term. Third, the two cases on which Neff relies to argue that franchisors "are liable" under the Civil Rights Act, *Wheeler v. Hurdman,* 825 F.2d 257 (10th Cir.1987), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987), and *Bradley v. Pizzaco,* 7 F.3d 795 (8th Cir.1993), are factually distinguishable.[16]

## III

For the foregoing reasons, we AFFIRM the district court's order granting ADQ's motion for summary judgment.

---

[16]In *Wheeler,* the Tenth Circuit held that a general partner was not an "employee" within the meaning of Title VII, the ADEA, and the Equal Pay Act. *id.* at 277 ("For the reasons stated above, we hold that bona fide general partners are not employees under the Anti-Discrimination Acts."). The only issue before the court in *Bradley* was whether the defendants had established a business justification defense for enforcing an allegedly discriminatory "no beard" policy. One of the defendants was a franchisor, Domino's Pizza, Inc., but the court did not address the basis for Domino's liability under Title VII. However, the court's recitation of the facts demonstrates that the allegedly discriminatory "no beard" policy was "established nationwide by [the] franchisor, Domino's Pizza, Inc.," *id.* at 796, and thus was a direct result of an affirmative act by the franchisor.