992 F.Supp. 1114 (1998)
Justin TATUM, Plaintiff,
v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and St. Louis University, Defendants.
No. 4:97CV2592-DJS.
United States District Court, E.D. Missouri, Eastern Division.
January 23, 1998.
*1115 *1116 William A. Hellmich, Kurt A. Hentz, John N. Borbonus, III, John T. Banjak, King and Koster, St. Louis, MO, for Justin Tatum.
Frank N. Gundlach, Armstrong and Teasdale, St. Louis, MO, Linda Salfrank, Swanson and Midgley, Kansas City, MO, for National Collegiate Athletic Ass'n.
Ian P. Cooper, Peper and Martin, St. Louis, MO, for St. Louis University.
Edwin B. Brzezinski, Sr., Asst. U.S. Atty., St. Louis, MO, for U.S.

ORDER
STOHR, District Judge.
On December 30, 1997, plaintiff filed a complaint and motion for temporary restraining order against defendants National Collegiate Athletic Association ("NCAA") and St. Louis University ("SLU") alleging that the NCAA discriminated against him on the basis of his disability when it refused to recognize a nonstandard, untimed ACT score for purposes of determining whether he was eligible to participate in Division I intercollegiate athletics.[1] In the Spring of his senior year of high school, based on a diagnosis of generalized anxiety disorder with a specific phobia related to testing, plaintiff was permitted to take the American College Test ("ACT") in a nonstandard format. Plaintiff argues that the NCAA's failure to recognize the scores from these nonstandard tests violates Title III of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.
The Court heard arguments on December 30, 1997 and issued an order denying plaintiff's *1117 motion for temporary restraining order on January 2, 1998. This matter is now before the Court on plaintiff's request for preliminary injunction. Although plaintiff has not filed a written motion for preliminary injunction, plaintiff's complaint requests preliminary injunctive relief. The Court heard evidence from the parties on January 14, 16, and 20, 1998.

I. Facts
The following facts are undisputed. Plaintiff is an 18-year-old freshman student enrolled at St. Louis University. Defendant St. Louis University ("SLU") offered plaintiff a full athletic scholarship to play basketball with the contingency that plaintiff attain "qualifier" status from the NCAA. In order to be certified as a "qualifier," a student-athlete must graduate from high school, pass at least thirteen identified high school "core courses" and achieve a score on either the ACT or SAT[2] which when viewed in conjunction with the athlete's grade point average ("GPA") in the identified core courses satisfies the NCAA's sliding scale contained in the NCAA Bylaw 14.3.1.1.1. In June of 1997, plaintiff graduated from Christian Brothers College High School ("CBC") where he received a GPA of 2.269 in his core courses. With that GPA, the sliding scale provides that a student must attain a score of 77 or higher on the ACT to be eligible to participate in Division I intercollegiate athletics.
Plaintiff has a history throughout his school years of performing better on daily class work assignments than on major exams or standardized tests. Plaintiff began attending CBC during his sophomore year in high school and this pattern continued. However, plaintiff admits that he did not truly dedicate himself to his studies until his junior year in high school. By the middle of his junior year, plaintiff's guidance counselor, Tom Farishon, noted his difficulty with test taking and approached plaintiff who indicated that he felt distracted and nervous when testing. Subsequently, Farishon spoke with some of his teachers about the problem. After discussions with Farishon, plaintiff's math, history and Spanish teachers allowed him extra time in which to complete tests. At that time, no formal documentation of these accommodations was made. Plaintiff admits that he rarely used the offered extended time and felt that he did not need extra time when he was well prepared.
Also during his junior year, plaintiff began taking the ACT under standard conditions. Plaintiff received aid from several outside sources in his preparation for the standardized test. By the fall of his senior year, it was apparent that plaintiff had failed to achieve a score which would qualify him to participate in Division I intercollegiate athletics under the NCAA Bylaws. Concerned with the possible loss of plaintiff's scholarship offer, Farishon recommended that plaintiff be evaluated for potential disabilities. Upon Farishon's suggestion, plaintiff's mother arranged an appointment for an evaluation of plaintiff for possible learning disabilities at the St. Louis University's Psychological Services Center.
Subsequently, in February of 1997, plaintiff was evaluated by a doctoral candidate, Mark Bender, under the supervision of Dr. Paul Handal, a licensed psychologist. Bender concluded that plaintiff did not have a learning disability and instead recommended tutoring and therapy. Additionally, Bender noted that, "[u]nfortunately, [plaintiff] has not historically shown to have a strong commitment to his academic performance." Bender further noted plaintiff's academic concerns and his difficulty managing school work, basketball and ACT preparation. Bender also concluded that plaintiff did not have any psychological disorder and instead, needed to spend more time on his studies.
A copy of Bender's report was sent to Farishon who in turn reviewed it with another CBC guidance counselor, Helen Friedel, who had studied learning disabilities extensively. Friedel had concerns with the contents of the report and believed that it raised serious questions. Consequently, Friedel recommended that plaintiff be re-evaluated by a different psychologist. Plaintiff's mother was also dissatisfied with the Bender report.
*1118 When Bender reviewed his findings with plaintiff's mother, she indicated to both Bender, and later to his supervisor, Dr. Handal, that she believed her son's problem to be test taking anxiety. In response to plaintiff's mother's request, Bender performed three additional psychological tests on plaintiff and composed a second report which concluded that plaintiff did not suffer from a learning disability or test taking anxiety. Upon completion of the second report, Bender notified plaintiff's mother who said she did not wish to see the results. The report was never released to anyone else and remained in the Psychological Services Center's files. The contents of the revised report did not surface until the commencement of the present litigation.
During the Spring semester of plaintiff's senior year, approximately one month after Mr. Bender had conducted his evaluation, plaintiff was evaluated by Dr. Judith A. Tindall, a licensed psychologist. After reviewing the report written by Mr. Bender, conducting several psychological tests, and interviewing plaintiff, his mother, and his counselor, Dr. Tindall concluded that plaintiff suffered from generalized anxiety disorder and a specific phobia related to test taking, diagnoses recognized in the American Psychiatric Association's Diagnostic and Statistical Manual, 4th edition ("DSM-IV"). Pursuant to her diagnosis, Dr. Tindall's recommendations included that plaintiff be permitted to take tests in an untimed fashion, allowing him to take breaks. Dr. Tindall also recommended that test questions be read to plaintiff, enabling him to utilize his auditory strengths.
Based on Dr. Tindall's diagnosis, plaintiff then applied to take the ACT under the aforementioned special nonstandard conditions. Plaintiff's applications for nonstandard tests were approved on three occasions and plaintiff took the ACT untimed in May, August, and October of 1997. Prior to his diagnosis by Dr. Tindall, plaintiff had also taken the ACT under the standard conditions.
The NCAA Bylaws permit a student-athlete to combine his best scores on each of the four subparts of the ACT from more than one testing date to arrive at a qualifying score. If the NCAA were to recognize plaintiff's scores from the nonstandard tests, the first time that plaintiff achieved a sufficient composite score was after the October 1997 nonstandard test session. Plaintiff's performance on some of his nonstandard tests was very similar to his performance under the standard conditions. However, if the nonstandard results were recognized, plaintiff's composite score would be 79, two points higher than the score required by the sliding scale.
The NCAA's policy relating to the acceptance of untimed tests is contained in Bylaw 14.3.1.4.3 and provides:
Nonstandard Test Administration. The Academi cs/Eligibility/Compliance Cabinet may approve the use of scores achieved during a nonstandard administration of the SAT or ACT for learning-disabled or handicapped students. A student who takes a nonstandard SAT or ACT still must achieve the minimum required test score; however, the test does not have to be administered on a national testing date.
(emphasis added). According to the NCAA policy, upon submission of nonstandard scores, the NCAA forwards all documentation to its consultant on learning disabilities, Dr. Donald Deschler. In this case, Dr. Deschler concluded that because plaintiff did not have a learning disability or a physical disability, his nonstandard scores would not be accepted, although he recognized plaintiff's test-taking problems. Upon the NCAA's request, Friedel, CBC's guidance counselor specializing in learning disabilities, composed an Individualized Education Plan ("IEP") for plaintiff incorporating the recommendations that had been made by Dr. Tindall and also documenting accommodations that CBC had made available to plaintiff in the past. The IEP was created after plaintiff had graduated from CBC and did not purport to comply with state or federal guidelines. Friedel indicated that it was merely intended to serve as a memorialization of the accommodations plaintiff had been afforded and a documentation of Dr. Tindall's recommendations.
On December 17, 1997, the NCAA Clearinghouse issued its Initial Eligibility Certification Report notifying plaintiff that he *1119 would not be certified as a "qualifier" because he had failed to achieve an adequate standardized ACT score.
Plaintiff is currently enrolled at SLU as a full time student. Prior to this semester, plaintiff had also attended the summer enrichment program and the fall semester (on academic probation) during which he took twelve credit hours. SLU has recognized Dr. Tindall's diagnosis and plaintiff has been afforded accommodations related to testing at SLU. Plaintiff admits that he has only availed himself of these accommodations in one class on a very limited number of occasions.

II. Subject Matter Jurisdiction
Before reaching the issue of whether preliminary injunctive relief is appropriate, the Court must address the threshold issue of subject matter jurisdiction.[3]See Elitt v. U.S.A. Hockey, 922 F.Supp. 217, 223 (E.D.Mo.1996), citing Turner v. Armontrout, 922 F.2d 492, 493 (8th Cir.1991). Plaintiff brings this cause of action against the NCAA under Title III of the ADA which provides in pertinent part:
No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation or by any person who owns, leases (or leases to), or operates a place of public accommodation.
42 U.S.C. § 12182(a). For this portion of the ADA to apply to the NCAA, it must be properly classified either as a place of public accommodation or an operator of a place of public accommodation. Regulations define "place of public accommodation" as "a facility,[4] operated by a private entity whose operations affect commerce and fall within at least one of the ... [twelve] categories." 28 C.F.R. § 36.104. The NCAA is properly viewed as a private organization. National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 190-99, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). "The NCAA is an unincorporated association of approximately 960 members, including virtually all public and private universities and 4-year college conducting major athletic programs in the United States. Basic policies of the NCAA are determined by the members at annual conventions." Id. at 183.
Plaintiff and the United States argue that the NCAA has significant contacts with several of the enumerated places of public accommodation listed in the aforementioned twelve categories including: a stadium, or other place of exhibition or entertainment; an auditorium, convention center ... or other place of public gathering; and a gymnasium ... or other place of exercise or recreation. 42 U.S.C. § 12181(7)(C), (D) and (L). Based on the NCAA's significant contacts with these facilities, plaintiff argues that the NCAA operates a place of public accommodation for purposes of Title III of the ADA.
Plaintiff argues that the relevant case law supports his position that Title III of the ADA applies to the NCAA. For his primary support, plaintiff cites Ganden v. National Collegiate Athletic Ass'n, No. 96C-6953, 1996 WL 680000 (N.D.Ill.1996). The court in Ganden stated that if a membership organization has a close connection to a particular facility, the organization could be classified as a place of public accommodation for purposes of Title III of the ADA. To demonstrate a close connection, it must be shown that "(1) the organization is affiliated with a particular facility, and (2) membership in (or certification by) that organization acts as a necessary predicate to use of the facility." Id. At *10. With facts similar to the present case the court in Ganden held that:

*1120 Although uncertain, the court finds that Ganden has a reasonable likelihood of demonstrating that the NCAA both (1) "operates" the swimming facilities of MSU and other participating member institutions within the meaning of Title III, and (2) is "closely connected" to those same particular facilities in such a manner as to function as a "ticket" to the primary use of those facilities.
Id. at *11; see also Dennin v. Connecticut Interscholastic Athletic Conf., 913 F.Supp. 663, 670 (D.Conn.), vacated as moot, 94 F.3d 96 (2d Cir.1996) ("CIAC sponsors athletic competitions and tournaments. By managing and controlling the aforementioned, it "operates" places of public accommodations.")
Additionally, in its amicus memorandum of law, the United States cites Butler v. National Collegiate Athletic Ass'n, No. C96-1656D, (W.D.Wa. Nov. 8, 1996). The Butler court reached the same conclusion, noting that the issue involves remedial legislation which should be construed broadly rather than narrowly. See Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Additionally, the Butler court recognizes that the United States Department of Justice has been delegated the authority to promulgate regulations under Title III. 42 U.S.C. § 12186. Citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Butler court also noted that "where Congress expressly delegates authority to an agency to promulgate regulations, the regulations `are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" Butler, slip op. at 8. Plaintiff has submitted a letter written by the Civil Rights Division of the Department of Justice to Kevin Lennon, the NCAA's Director of Membership Services. The letter demonstrates that it is the position of the Department of Justice that many of the NCAA's eligibility requirements may be violative of Title III of the ADA.
In addition to case law and the Department of Justice's position, plaintiff and the United States have provided evidence of several ways in which the NCAA controls the use of its member institutions' athletic facilities, such as by detailed regulations governing use of the facilities. For example, plaintiff argues that:
The NCAA Bylaws: permit member institutions to reserve athletic training facilities for student-athletes only; direct under what guidelines a student-athlete may voluntarily choose to use the athletic training facilities; regulate the number of days a student-athlete may practice in the athletic training facilities; control what equipment may be used while the student-athlete uses the athletic training facilities; control the types of "conditioning activities" the student-athlete may use; control the conditions surrounding when a student-athlete may seek advice or instruction from a coach; and regulate under what conditions individuals not enrolled in the school may use the athletic training facilities.
Pltf's Mem., [Doc. # 31], 4 (internal citations to NCAA Bylaws omitted).
Evidence has also been presented that the NCAA exerts significant control over the operation of stadiums and auditoriums including: regulating ticket prices; controlling the types of beverages and goods that vendors may sell; regulating profits which may be earned from concession sales; controlling which press members may broadcast from the stadiums; and controlling which institutions are allowed to play in the stadiums. See United States' Amicus Mem., 7 (internal citations to NCAA Executive Regulations omitted). Additionally, with regard to championship events and tournaments, plaintiff has shown that the NCAA actually leases athletic facilities.
In response to the arguments of plaintiff and the United States, the NCAA contends that the Department of Justice's interpretation is not entitled to deference (1) because the statute is clear and unambiguous, citing K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), and (2) because the Department of Justice is acting as a "prosecutor," citing Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In this instance, the Court finds NCAA's arguments unpersuasive. In the *1121 context of membership organizations, the phrase "operates a place of public accommodation" is not clear and unambiguous and the interpretation of the agency charged with promulgating regulations under the ADA is helpful. In the regulations, the Department of Justice has provided that a place of public accommodation is "a facility, operated by a private entity, whose operations affect commerce and fall within [certain] categories." 28 C.F.R. § 36.104. The Department of Justice is not acting as an interested party in this matter. It has taken no position as to the merits of plaintiff's individual case and therefore, the Court finds the NCAA's argument to the contrary to be unpersuasive.
Additionally, the NCAA relies on a line of cases where courts have generally excluded membership organizations from the definition of public accommodations, either for purposes of Title III of the ADA or Title II of the Civil Rights Act, which has been held to provide instructive analysis in Title III ADA cases. See, e.g., Welsh v. Boy Scouts of America, 993 F.2d 1267, 1269 (7th Cir.1993), cert. denied, 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993); Elitt v. U.S.A. Hockey, 922 F.Supp. 217, 223 (E.D.Mo.1996); see also Stoutenborough v. National Football League, Inc., 59 F.3d 580, 583 (6th Cir.), cert. denied, 516 U.S. 1028, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995); Brown v. 1995 Tenet ParaAmerica Bicycle Challenge, 959 F.Supp. 496, 499 (N.D.Ill.1997) (umbrella group charged with organizing event does not fall within the twelve specific categories enumerated in 42 U.S.C. § 12181(7)). However, these cases "dealt with member organizations as organizations, not as the operators of facilities that might, in turn be considered places of public accommodation." Butler, slip op. at 7.
The NCAA also argues that it does not exert sufficient control so as to be classified as "operating" its member institutions' facilities. In Neff v. American Dairy Queen Corp., 58 F.3d 1063, 1066 (5th Cir.1995), cert. denied, 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996), the court found that because the ADA does not define the term "operates" it should be construed in accord with its ordinary and natural meaning. The Neff court found that to "operate" was to "put or keep in operation," "to control or direct the functioning of," or "to conduct the affairs of; manage." Neff, 58 F.3d at 1066 (citing various dictionaries).
In light of the evidence discussed earlier, the Court finds that plaintiff has demonstrated that the NCAA operates a place of public accommodation for purposes of Title III of the ADA. The significant degree of control that the NCAA exerts over the athletic facilities of its member institutions, the position of the Department of Justice, and the relevant case law all support plaintiff's argument that the NCAA is governed by Title III of the ADA.

III. Preliminary Injunction
When considering whether to grant preliminary injunctive relief, the Court must consider: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc); see also Goff v. Harper, 60 F.3d 518, 520 (8th Cir.1995).

A. Threat of Irreparable Harm
Plaintiff correctly argues that he has no adequate remedy at law. Title III of the ADA does not provide for monetary compensation, therefore injunctive relief is plaintiff's only remedy. Additionally, were the Court to deny plaintiff's motion for preliminary injunction, plaintiff would remain ineligible to participate in Division I intercollegiate sports until he had been enrolled full-time for two semesters, which at the earliest is Spring of 1999. At that time, plaintiff would only be permitted three years of eligibility. This may constitute a significant harm due to the loss of one year of development and maturity in athletics as well as the benefits of participating with the team as it is presently composed. Some case law supports the determination that the loss of athletic eligibility can constitute irreparable harm. See e.g., Butler, slip op. at 10; Ganden, 1996 WL 680000 at *6. Absent injunctive relief, plaintiff faces the *1122 loss of his athletic scholarship and potentially the means necessary to attend SLU. Even if the Court were later to order reinstatement of a year of eligibility, it would apply at the end of plaintiff's academic career, thus requiring that plaintiff spend five years in college.
The NCAA argues that plaintiff's grades in college thus far indicate that an injunction declaring him eligible may do him more harm than good. It is true that plaintiff is on academic probation. It is uncertain whether he will be able to maintain a sufficient GPA to remain in good standing at SLU and thus maintain any athletic eligibility that could be ordered here. Accordingly, although plaintiff has successfully demonstrated a threat of irreparable harm, the aforementioned academic concerns indicate that the factor of irreparable harm does not weigh strongly in favor of plaintiff.

B. Balance of the Harms
The Court concludes that the balance of the harms weighs in favor of plaintiff. As discussed above, although not a certainty, plaintiff may suffer undue harm if he wrongly loses a year of eligibility to participate in sports. The NCAA argues that any harm to plaintiff is greatly outweighed by the harm it will suffer if an injunction is granted. The NCAA contends that
allowing plaintiff to compete when he is clearly ineligible would undermine NCAA's ability to enforce their academic standards and would irreparably damage NCAA's integrity and effectiveness in maintaining academic requirements for its student-athletes.
NCAA's Mem. in Opp. [Doc. # 32], 36.
Despite the NCAA's contentions, there is ample evidence that the NCAA regularly accepts nonstandard ACT and SAT test scores. Of 1498 requests made in 1996 for approval of nonstandard test scores, only 5 were rejected. The five rejections resulted from the applicant's failure to include the proper proctor statements and not because the NCAA rejected the underlying diagnosis as invalid. The NCAA is willing to make accommodations for student-athletes with learning disabilities and physical disabilities. However, the NCAA apparently classifies psychological disorders differently. Although it recognizes and allows accommodations for attention deficit disorder (ADD), it has never accepted nonstandard scores for other psychological disorders and has indicated that it would be "hard-pressed" to find a situation where it would recognize a psychological disorder such as generalized anxiety disorder as a basis for accepting a nonstandard test score. Despite this position, the NCAA insists that it continues to examine all requests for the acceptance of nonstandard scores on a case by case basis. Because the NCAA is willing to accommodate individuals with learning disabilities and physical disabilities, the harm it would suffer by recognizing the nonstandard score of a student-athlete with a psychological disorder does not outweigh the potential harm to the plaintiff.

C. Public Interest
The Court is not persuaded that the public interest factor weights strongly in favor of or against granting the injunction. Plaintiff argues that the public has a significant interest in ensuring that people are not denied opportunities on the basis of a disability in violation of the ADA. The NCAA argues that the determination of who is eligible to participate in intercollegiate sports should be left with the NCAA because it is in the best position to develop and apply the standards aimed to predict the success of student-athletes. See Shelton v. National Collegiate Athletic Ass'n, 539 F.2d 1197 (9th Cir.1976). Moreover, the NCAA asserts that the public has an interest in the protection of amateur athletes and the maintenance of a level playing field for all student competitors. The Court finds that the public interest here does not heavily favor either plaintiff or the NCAA although it recognizes the public concerns identified by both parties.

D. Likelihood of Success on the Merits
In order to achieve success on the merits of his claim, plaintiff must prove that the NCAA discriminated against him on the basis of his disability. For purposes of the ADA, a disability is defined as:

*1123 a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of having such an impairment; or being regarded as having such an impairment.
28 C.F.R. § 36.104. Additionally, plaintiff must demonstrate that his requested accommodation (1) is reasonable and (2) does not fundamentally alter the nature of the program. See 42 U.S.C. § 12182(b)(2)(A)(ii).
The Court finds that plaintiff has not demonstrated a substantial likelihood of establishing that he has a disability as defined by the regulations. First, plaintiff must show that he has a physical or mental impairment. Plaintiff was not seriously evaluated for mental impairments until the second semester of his senior year in high school and only after it was evident that he could not meet the NCAA's required ACT score to attain "qualifier" status. Additionally, plaintiff was evaluated on two occasions by different individuals resulting in conflicting diagnoses made approximately one month apart. Mr. Bender and his supervisor, Dr. Handal, at the SLU Psychological Services Center concluded that plaintiff did not suffer from any mental impairment and that his problems related to testing resulted from a lack of effort and preparation. Even Dr. Tindall, who diagnosed plaintiff as having generalized anxiety disorder with a specific phobia related to testimony admitted on cross-examination that plaintiff's poor performance on standardized tests could possibly be related to a lack of motivation or preparation. Accordingly, plaintiff has not shown a substantial likelihood of proving that he suffers from a mental impairment.
Even if plaintiff were to prove that he had a mental impairment, he must also prove that his impairment substantially limited a major life activity. The impairment must be shown to be significant. Forrisi v. Bowen, 794 F.2d 931, 933-34 (4th Cir.1986). Here, the substantial impact of plaintiff's alleged disability is questionable. Plaintiff admitted that he did not put the requisite effort into his school work until his junior year. Moreover, problems with testing did not cause him to seek treatment until the second semester of his senior year. Even Tom Farishon, plaintiff's guidance counselor, admitted that plaintiff was able to complete tests in his health class within the regular time constraints. Plaintiff himself testified that when he felt prepared, he did not need any accommodations.
Additionally, the disparity between plaintiff's standard and nonstandard ACT scores is not so great as to imply that plaintiff's alleged mental impairment substantially limited his ability to take the test under timed conditions. Although plaintiff argues that he was afforded accommodations for his testing problems at CBC, he admits that he rarely took advantage of same. Moreover, although accommodations are currently available to plaintiff at SLU, plaintiff has only availed himself of extra time in one class on a very limited basis. Consequently, there is no consistent history that demonstrates plaintiff's need for accommodations as a result of his alleged mental impairment. Accordingly, the Court finds that plaintiff has not shown a likelihood of proving that his alleged mental impairment substantially limits one or more major life activities.[5]

IV. Conclusion
After balancing the Dataphase factors, the Court concludes that they weigh against granting relief. The lack of certainty surrounding plaintiff's irreparable harm coupled with the lack of a substantial likelihood of success on the merits warrant denial of plaintiff's motion for preliminary injunction.
*1124 Accordingly,
IT IS HEREBY ORDERED that plaintiff's request for preliminary injunction is denied.
NOTES
[1] Plaintiff has included SLU as a defendant in this action because "in its absence, complete relief cannot be afforded to the parties. In particular, Tatum seeks an Order herein requiring SLU to honor its commitment to provide Tatum a full athletic scholarship once he is determined to be a qualifier." Pltf's Complaint, 2. Plaintiff does not bring a separate cause of action against SLU.
[2] Scholastic Aptitude Test.
[3] On January 12, 1998, the Court granted the United States leave to file an amicus curiae memorandum on contending that Title III of the ADA applies to the NCAA. However, the Court denied the United States leave to participate in oral argument. In its memorandum of law, the United States does not take a position on any of the other issues relating to the merits of plaintiff's case.
[4] "Facility" is defined as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure or equipment is located." 28 C.F.R. § 36.104.
[5] Because the Court has concluded that the plaintiff has failed to demonstrate a likelihood of success on the merits on the aforementioned elements, it need not reach the issue of whether or not test taking constitutes a major life activity. Additionally, the Court need not reach the issue of whether plaintiff's requested accommodation was reasonable or whether it would fundamentally alter the nature of the program. However, the Court believes that untimed tests are not an unreasonable accommodation when requests are properly substantiated. Also, the acceptance of untimed tests would not fundamentally alter the nature of the NCAA eligibility criteria in the case of a confirmed disability with a history of accommodations. As mentioned earlier, it is already a regular practice of the NCAA to accept nonstandard scores in the case of learning disabilities and physical disabilities.