John E. DAHLBERG, Plaintiff,

v.

AVIS RENT A CAR SYSTEM, INC., Defendant.

Civil Action No. 98 N 2475.

United States District Court, D. Colorado.

March 31, 2000.

Dennis W. Brown, Baldwin & Brown, PC, Denver, CO, for plaintiff.

Gregory J. Kerwin, Jeffrey E. Oraker, Gibson Dunn & Crutcher, LLP., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

This is a disability discrimination case. Plaintiff John E. Dahlberg claims that Defendant Avis Rent A Car System, Inc. ("Avis") violated the Americans with Disabilities Act, 42 U.S.C.A. §§ 12101 to 12213 (West 1995 & Supp.1999) [hereinafter "ADA"], by discriminating against him on the basis of his disability. Dahlberg also asserts various state statutory and common-law claims. This matter is before the court on "Defendant's Motion for Summary Judgment" filed July 12, 1999, as well as numerous motions to supplement the record with additional exhibits, arguments, and briefs of *amicus curiae*. Jurisdiction is based on 28 U.S.C.A. §§ 1331, 1343(a)(4), and 1367 (West 1993).

**FACTS**

### 1. General Background

Avis is a car-rental company which employs between 15,000 and 20,000 employees in the United States. (Def.'s Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed July 12, 1999] [hereinafter "Def.'s Br."]; *admitted at* Pl.'s Resp. to Def.'s Mot. Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 1 [filed Aug. 2, 1999] [hereinafter "Pl.'s Resp."].) In 1996, 1997, and 1998, Avis rented an average of 750 cars each year to customers requesting hand-controlled vehicles. (*Id.*, Statement of Undisputed Material Facts ¶ 8.)[1] There are approximately 1400 Avis locations in the United States. (*Id.*, Statement of Undisputed Material Facts ¶ 1; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 1.) At present, Avis owns approximately ninety-two percent of the locations, and independent licensees own and operate the remaining eight percent of Avis locations. (*Id.*, Statement of Undisputed Material Facts ¶ 1; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 1.)

Dahlberg, a disabled individual who uses a wheelchair for mobility, travels frequently on business as a consultant. (Compl. and Jury Demand ¶ 1 [filed Nov. 12, 1998] [hereinafter "Compl."]; *admitted at* Def.'s Answer to Pl.'s Compl. ¶ 1 [filed May 7, 1999] [hereinafter "Answer"].) Dahlberg takes between fifty and eighty business trips annually. From 1984 through 1997, Dahlberg rented approximately forty to sixty cars each year. (Def.'s Br., Statement of Undisputed Material Facts ¶ 46; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 46.)

---

1. In his response, Dahlberg frequently contends that Avis' offered undisputed facts are actually disputed. In certain instances, Dahlberg's denials of Avis' undisputed facts are unresponsive to the asserted fact and, in other instances, he responds with argument or a legal conclusion to Avis' proffered undisputed fact. In such situations, the facts which Avis asserts are deemed admitted for purposes of this order, to the extent that they are supported by the record, and I cite only to Avis' brief.

### 2. Avis' Dealings with the Justice Department

Avis has been renting D and E class vehicles with hand controls to its disabled customers since 1965.[2] (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 5.) At the time that Congress passed the ADA in 1990, Avis was making hand-controlled vehicles available to disabled customers at no additional charge. (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 5.) Sometime after the passage of the ADA, the United States Department of Justice ("Justice Department") began investigating whether Avis' policies regarding car rentals to disabled customers were in compliance with the ADA. In 1994, Avis and the Justice Department entered into an agreement ("Settlement Agreement") concerning allegations that Avis had violated the ADA by failing to provide disabled renters with hand-controlled vehicles for the full range of vehicles that Avis made available to the general public. (*Id.*, Statement of Undisputed Material Facts ¶ 36; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 36.) The Settlement Agreement requires Avis to use its "best efforts" to provide hand-controlled vehicles in the Z, B, D, E, and H classes. (*Id.*, Statement of Undisputed Material Facts ¶ 39; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 39.) The Settlement Agreement further requires Avis to notify non-Avis-owned licensees of the provisions of the Settlement Agreement and urge them to adopt the policies memorialized therein. (*Id.*, Statement of Undisputed Material Facts ¶ 40; *admitted in pertinent part at* Pl.'s Resp.,

Resp. to Statement of Undisputed Material Facts ¶ 40.)

In 1996, Avis entered into an amendment to the Settlement Agreement ("1996 Amendment") as a result of a further Justice Department investigation into allegations that Avis had refused to rent a vehicle to a disabled person who did not have a driver's license but who was able to establish personal and financial responsibility and was accompanied by a person possessing a valid driver's license. (*Id.*, Statement of Undisputed Material Facts ¶ 41; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 41.) In the 1996 Amendment, Avis agreed to add class K vehicles—convertibles—to the categories of hand-controlled vehicles available for renters and further agreed to purchase nine hand-control units for the 1995 Chrysler LeBaron convertible. (*Id.*, Statement of Undisputed Material Facts ¶ 43; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 43.) Avis also agreed to implement additional procedures to educate its employees about Avis' policies and procedures with respect to disabled customers. (*Id.*, Statement of Undisputed Material Facts ¶ 44; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 44.) In particular, Avis agreed in the 1996 Amendment to (1) designate a specific employee as Avis' "disability services coordinator" to be responsible for reservations made by renters with disabilities, and (2) develop procedures for coordinating and following up on reservations made by persons with disabilities outside of regular business hours or during the designated disability services coordinator's absences. (*Id.*, Ex. A–4 [1996 Amendment ¶¶ 7(j),(k) ].)

In the 1996 Amendment, the Justice Department noted that: (1) Avis employs more than 3000 customer service represen-

---

**2.** Avis identifies the types of cars in its rental fleet by letter code: A (four-door subcompact), Z (two-door compact), B (four-door compact), C (intermediate), D (two-door full size), E (four-door full size), H (luxury), K (convertible), W (sport-utility vehicle), S (satellite guidance system), and V (minivan). (Pl.'s Resp., Ex. 22 [printout of http://www.avis.com].)

tatives at its corporate locations and that more than 300 of Avis' agency locations employ one or more workers per location; (2) Avis takes approximately 23,000,000 car rental reservations annually; (3) approximately forty percent of Avis' customer service representatives and supervisors are new hires in any given year; and (4) because of the sheer volume of reservations and the realities of Avis' staffing, it is inevitable that both disabled and non-disabled customers will sometimes experience difficulties and delays in the provision of car rental services. (*Id.*, Statement of Undisputed Material Facts ¶ 45; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 45.) The 1996 Amendment provides that the Justice Department agreed that full implementation of actions in the Settlement Agreement, as amended by the 1996 Amendment, constitutes best efforts by Avis to comply with the provisions of the ADA addressed in the 1996 Amendment and constitutes evidence of Avis' good faith under the ADA, in the absence of clear evidence to the contrary. (*Id.*, Statement of Undisputed Material Facts ¶ 45; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 45.)

### 3. Avis' Reservation System for Hand–Controlled Cars

Avis currently installs Kroepke hand controls into its vehicles when a customer requests a hand-controlled vehicle. (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 20.) Kroepke hand controls are not universal and different controls may be required to fit different models of cars.[3] (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 20.) If

Kroepke makes a hand control for the type of vehicle which a customer requests, Avis will generally attempt to obtain the Kroepke hand control for that specific type of car, even if the car is not a model for which Avis normally has hand controls. (*Id.*, Statement of Undisputed Material Facts ¶ 24; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 24.) Kroepke hand controls must be installed in a vehicle by a mechanic, and installation typically takes about an hour. (*Id.*, Statement of Undisputed Material Facts ¶ 21; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 21.) Once a Kroepke hand control is installed, the car is taken out of rental circulation because Avis does not rent hand-controlled cars to renters not requesting hand controls. (*Id.*, Statement of Undisputed Material Facts ¶ 21; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 21.)

Pursuant to the 1996 Amendment, Avis has appointed a permanent disability services coordinator at its reservation center in Tulsa, Oklahoma. At present, Dorothy Cole holds the position. (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 6.) Cole also has a full-time assistant, Pam Burton. (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 6.) Cole and Burton are responsible for making all necessary arrangements for customers requesting cars with hand controls, and typically handle between 200 and 300 inquiries per month regarding hand-controlled vehicles. (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 6.) Avis also main-

---

3. Avis has tested hand controls designed to be universal in its rental car fleet and has received negative feedback from its customers on these universal controls. (*Id.*, Statement of Undisputed Material Facts ¶ 19; *admitted in pertinent part at* Pl.'s Resp., Resp. to State-

ment of Undisputed Material Facts ¶ 19.) While Dahlberg admits that Avis has received this negative feedback, he questions the reliability of Avis' methods of obtaining the data. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 19.)

tains a special services department, the so-called "Omni" department, open twenty-four hours a day, which is responsible for processing urgent requests for hand-controlled cars when Cole or Burton are not available to handle the requests. (*Id.,* Statement of Undisputed Material Facts ¶ 7; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 7.)

Avis uses a central reservation processing computer system, the Wizard system, to process the bulk of its reservations. Avis treats requests for hand controls as a special request, analogous to requesting a particular color of vehicle or a special location for returning a rented vehicle. Its procedures for handling requests for rental vehicles equipped with hand controls therefore differ from its procedures for handling reservations for the typical car rental. (*Id.,* Statement of Undisputed Material Facts ¶ 11; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 11.) When a customer or travel agent calls Avis' reservations phone number requesting a hand-controlled vehicle, Avis transfers the call to the Omni department, where an employee completes a request form for a hand-controlled vehicle. (*Id.,* Statement of Undisputed Material Facts ¶ 12; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 12.) This form is typically sent to Cole or Burton, who then call the rental facility where the car is needed to confirm that the requested car or an alternative car can be made available and that hand controls are available for the vehicle. (*Id.,* Statement of Undisputed Material Facts ¶ 13; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 13.) If the requested car is available but the rental location is sold out of hand controls for that model, Cole or Burton then assist the rental location in ordering a new set of hand controls or borrowing appropriate hand controls from another Avis location. (*Id.,* Statement of Undisputed Material Facts ¶ 13; *admitted in pertinent part at* Pl.'s Resp., Resp. to

Statement of Undisputed Material Facts ¶ 13.) Once Cole or Burton have confirmed the availability of a car with hand controls, they contact the customer or his or her travel agent with the information, including information of what class of car can be provided. (*Id.,* Statement of Undisputed Material Facts ¶ 13; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 13.)

Customers also can make reservations through an airline computer reservation system, such as the so-called Apollo system which United Air Lines operates, or over the internet. (*Id.,* Statement of Undisputed Material Facts ¶¶ 15–16; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 15–16.) Avis did not design the Apollo system or any other airline's reservation system, and it does not control, maintain, or run these systems. (*Id.,* Statement of Undisputed Material Facts ¶ 15; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.) If a customer or travel agent tries to reserve a hand-controlled car using the internet or an outside computer reservation system, the system is designed to alert the customer or travel agent to call Avis directly to arrange for the reservation of a car with hand controls. (*Id.,* Statement of Undisputed Material Facts ¶ 16.) Avis then processes the reservation request in accordance with its internal procedures described above.

There is no additional charge for the installation of hand controls into rental vehicles. (*Id.,* Statement of Undisputed Material Facts ¶ 18; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 18.) In accordance with the Settlement Agreement and the 1996 Amendment, it is Avis' current policy to equip cars in the Z, B, D, E, H, and K classes with hand controls. (*Id.,* Statement of Undisputed Material Facts ¶ 18; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed

Material Facts ¶ 18.) Also in accordance with the Settlement Agreement and the 1996 Amendment, it is Avis' policy to require advance notice for hand control equipped car reservations of: (1) eight hours at major airport locations; (2) twenty-four hours at other rental locations which are open twenty-four hours per day; (3) twenty-four hours at rental locations open until 11:00 o'clock p.m., seven days a week; and (4) forty-eight hours at all other rental locations. (*Id.*, Statement of Undisputed Material Facts ¶ 18; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 18.)

### 4. Dahlberg's Dealings with Avis [4]

#### a. November 12, 1996, Incident

Dahlberg made a confirmed reservation for a vehicle to be picked up at Avis' Los Angeles International Airport rental location ("LAX facility") on November 11, 1996, at 3:30 o'clock p.m. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 47.) On November 11, 1996, he changed his reservation to November 12, 1996, which change Avis confirmed. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) When Dahlberg arrived at the airport on November 12, 1996, he attempted to call the LAX facility, which was located outside the airport, from an Avis airport telephone to request transportation from the airport to the LAX facility. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) The Avis airport telephone was broken, but Dahlberg was able to get a message to an Avis shuttle driver, who took Dahlberg to the LAX facility after some delay. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) Once at the LAX facility, Dahlberg learned that his car was not ready because the hand control in his vehicle had been inspected and found to be defective and in need of replacement. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) Dahl-

berg experienced a delay of one-and-one-half to two hours. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) Dahlberg was not charged for the rental. (Def.'s Br., Statement of Undisputed Material Facts ¶ 47.)

#### b. December 4, 1996, Incident

On December 4, 1996, Dahlberg again traveled to Los Angeles and again sought to rent a hand-controlled car at the LAX facility. (*Id.*, Statement of Undisputed Material Facts ¶ 47; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 47.) Again, Avis' airport telephone was broken. (Pl.'s Resp. to Statement of Undisputed Material Facts ¶ 47.) Dahlberg attempted to flag down an Avis shuttle bus and, after narrowly avoiding being struck by the shuttle bus, elected to seek the assistance of a police officer to get a message to the LAX facility to send transportation to pick him up at the airport. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) The first vehicle sent was not wheelchair accessible and, after some delay, a wheelchair-accessible vehicle was sent to pick Dahlberg up and take him to the LAX facility. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) Avis did not charge Dahlberg for this rental. (Def.'s Br., Statement of Undisputed Material Facts ¶ 47.)

#### c. January 21–22, 1997, Incident

On an undisclosed date, Dahlberg reserved a car with hand controls to be picked up Avis' Fort Lauderdale, Florida facility. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 48.) When he arrived at the Fort Lauderdale facility, he was told that there was no vehicle for him, but was promised that a convertible would be delivered to his hotel on January 22, 1997. (*Id.*, Resp. to Statement of Un-

---

4. The parties appear to disagree strongly about Dahlberg's experiences with Avis. For purposes of this order, I accept Dahlberg's version of events to the extent that his version

is otherwise supported by the record. Where Avis disputes Dahlberg's version of the facts, I cite only to Dahlberg's response.

disputed Material Facts ¶ 48.) On January 22, 1997, Avis provided Dahlberg with a hand-controlled two-door full-size car at his hotel. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 48; *admitted at* Avis's Reply Br. in Supp. of its Mot. for Summ. J., Reply Concerning Undisputed Facts ¶ 48 [filed Aug. 18, 1999] [hereinafter "Def.'s Reply"].)

#### d. April 30, 1997, Incident

On April 28, 1997, Dahlberg's travel agent attempted to reserve a convertible equipped with hand controls at Avis' Miami, Florida location for April 30, 1997, but was informed that the Miami location was sold out of hand controls for that date. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 49.) Dahlberg then personally attempted to obtain the reservation, and was also advised by Avis that hand controls for a convertible were not available in Miami on April 30, 1997. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 49.) When he arrived in Miami on April 30, 1997, an Avis employee told Dahlberg that a convertible was available for rent, but that Avis would not equip it with hand controls. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 49.) Instead, Dahlberg received the two-door full-size car equipped with hand controls which he had previously reserved. (Def.'s Br., Statement of Undisputed Material Facts ¶ 49.)

#### e. March 1999, Incident

Dahlberg's travel agent made a reservation on Dahlberg's behalf through the Apollo reservation system for a luxury car equipped with hand controls for March 26, 1999, at Avis' Pensacola, Florida, location. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 50.) Dahlberg's travel agent did not call Avis directly to make the reservation. When Dahlberg and his family arrived in Pensacola on March 26, 1999, Avis employees informed Dahlberg that, although Avis had the luxury car for him per his reservation. Avis did not have the Kroepke hand control for the vehicle at the Pensacola location. (*Id.*,

Resp. to Statement of Undisputed Material Facts ¶ 50.) Avis employees also told Dahlberg that the entire southeast region was sold out of Kroepke hand controls for luxury cars and that Avis could not get the required hand control over the weekend. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 47.) On March 29, 1999, Avis provided Dahlberg with the hand-control equipped luxury vehicle at his hotel. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 50.)

#### 5. Procedural History

On November 12, 1998, Dahlberg filed his complaint in this court. (Compl.) Dahlberg originally asserted claims for: (1) violation of the ADA ("first claim") through its conduct toward him; (2) violation of ADA by breaching the Settlement Agreement, as amended by the 1996 Amendment ("second claim"); (3) breach of contract with Dahlberg as an intended third-party beneficiary to the Settlement Agreement and the 1996 Amendment thereto ("third claim"); (4) negligent misrepresentation ("fourth claim"); (5) breach of warranty ("fifth claim"); (6) outrageous conduct ("sixth claim"); and (7) fraud ("seventh claim"). (*Id.*) On January 19, 1999, Avis filed a motion to dismiss all of Dahlberg's claims. (Avis's Mot. to Dismiss for Failure to State a Claim [filed Jan. 19, 1999].) On April 20, 1999, I granted Dahlberg's April 7, 1999, motion to amend his complaint to add a claim under the Colorado Consumer Protection Act, Colo.Rev. Stat. §§ 6–1–101 to 6–1–412 (1999) [hereinafter "Consumer Protection Act"] ("eighth claim"). On April 23, 1999, in open court, I granted Avis' motion to dismiss Dahlberg's complaint in part. (Courtroom Mins. [filed Apr. 23, 1999].) In particular, I dismissed Dahlberg's second, third, and sixth claims in their entirety. (*Id.*) In addition, I dismissed as time barred Dahlberg's first, fourth, and fifth claims to the extent that these claims were predicated upon events which occurred prior to November 12, 1996. (*Id.*) I denied Avis' motion to dismiss in all other respects.

On July 12, 1999, Avis filed its motion for summary judgment. (Def.'s Br.) Avis contends that it is entitled to summary judgment as to Dahlberg's first claim under the ADA because (1) the ADA does not ensure that disabled individuals like Dahlberg will never experience the same inconveniences that other individuals experience in renting cars, and (2) Avis is in full compliance with ADA. (*Id.* at 16–23.) Avis further contends that it is entitled to summary judgment as to Dahlberg's state-law claims. (*Id.*)

## ANALYSIS

### 1. Legal Standard for Summary Judgment

Under rule 56(c), the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works of Colorado, Inc. v. Denver, City & County*, 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in his or her pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; Fed. R.Civ.P. 56(e). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985). The fac-

tual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 [10th Cir.1990] ).

### 2. First Claim: Disability Discrimination in Violation of the ADA

Congress enacted the ADA in 1990 in order to address what Congress found to be a "serious and pervasive social problem" of discrimination against individuals with disabilities in public accommodations, services, transportation, employment, and various other aspects of public life. 42 U.S.C.A. § 12101(a). The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(1). Congress intended to protect disabled persons not just from intentional discrimination, but also from "thoughtlessness," "indifference," and "benign neglect." *Crowder v. Kitagawa*, 81 F.3d 1480, 1483–84 (9th Cir.1996) (citations omitted). The ADA's mandate extends into three broad areas: (1) employment (title I); (2) public services (title II); and (3) places of public accommodation (title III). 42 U.S.C.A. §§ 12101 to 12213.

Title III of the ADA, under which Dahlberg brings his first claim, protects individuals against discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." *See* 42 U.S.C.A. § 12182(a). Discrimination includes, *inter alia:*

> (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demon-

strate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations

42 U.S.C.A. § 12182(b)(2)(A)(ii).[5]

■ Title III of the ADA does not provide for a private cause of action for damages. Rather, section 12188 provides that "the remedies and procedures set forth in [42 U.S.C.A.] section 2000a–3(a) ... are the remedies and procedures" available under title III. Section 2000a–3(a), in turn, limits the available remedies to "a civil action for preventative relief, including an application for a permanent or temporary injunction [or] restraining order." 42 U.S.C.A. § 2000a–3(a) (West 1994). A successful plaintiff may also be entitled to attorney fees and costs. *Id.* § 2000a–3(b). In order to prevail on a claim under title III of the ADA, Dahlberg must demonstrate that: (1) he is disabled within the meaning of the ADA; (2) Avis is a private entity that owns, leases, or operates a place of public accommodation; (3) that he was deprived of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation; and (4) Avis failed to make reasonable modifications which would accommodate Dahlberg's disability without fundamentally altering the nature of the public accommodation. 42 U.S.C.A. § 12182(a) & (b); *Amir v. Saint Louis Univ.,* 184 F.3d 1017, 1027 (8th Cir.1999).

Avis does not dispute that Dahlberg is disabled within the meaning of the ADA. Avis also concedes that is a private entity that owns, lease, or operates places of

public accommodation in Miami, Pensacola, and Fort Lauderdale. Avis contends, however, that, at the time of Dahlberg's dealings with the LAX facility, that facility was owned by an independent licensee and that Avis did not "operate" that facility for purposes of title III. (Def.'s Br. at 21.) Avis further contends that, while Dahlberg may have been inconvenienced, he was not deprived of the full and equal enjoyment of Avis' services. (*Id.* at 21–23.) Finally, Avis contends that Dahlberg has not presented evidence that Avis has failed to make those reasonable modifications which would accommodate his disability. (Def.'s Br. at 16–21.) I shall address each argument separately.

#### a. Liability for LAX Licensee's Actions

Avis contends that it cannot be held liable for the November 12, and December 4, 1996, incidents at the LAX facility because, at the time these incidents occurred, an independent licensee owned and operated the LAX facility and that this licensee controlled the conditions at that facility of which Dahlberg complains. (Def.'s Br. at 21.) It is undisputed that, until August 1997, the LAX facility was owned by an independent licensee who is not a party to the present dispute. (Def.'s Br., Statement of Undisputed Material Facts ¶ 29; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 29.) The terms of this licensee's dealings with Avis were memorialized in an agreement ("LAX Licensing Agreement") which Avis and the licensee en-

---

**5.** Discrimination under title III of the ADA also includes:

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

(iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals ..., where such removal is readily achievable ....

42 U.S.C.A. § 12182(b)(2)(a)(iii-iv). Dahlberg does not appear to assert claims under either of these subsections.

tered in 1956. (*Id.*, Statement of Undisputed Material Facts ¶ 29; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 29.) While Dahlberg's argument is not entirely clear, he appears to contend that Avis "operated" the LAX facility within the meaning of title III of the ADA during the relevant time period because: (1) Avis had sufficient control over the day-to-day operations of the LAX facility under the terms LAX Licensing Agreement; and (2) the LAX facility could use Avis' Wizard system for taking and processing rental reservations.

Contrary to Dahlberg's suggestion, the LAX licensee's ability to use the Wizard system and the degree control which Avis has over the day-to-day operations of the LAX facility are separate issues. Avis does not dispute that it operates the Wizard system and, thus, Avis clearly would be liable if its own reservation system results in disability discrimination. It does not necessarily follow from the fact that Avis operated the Wizard system that it also controlled the day-to-day operations of independently owned facilities such as the LAX facility, however. To the contrary, Avis' relationship with its licensee during the relevant time period existed pursuant to a contractual relationship which is memorialized in the LAX Licensing Agreement. The question is, therefore, whether the events Dahlberg complains of on November 12, and December 4, 1996, arose out of discriminatory conditions existing Avis' reservation system or were matters arising out of discriminatory conditions existing in the day-to-day opera-

tions of the LAX facility.[6] If the incidents arose out of the latter, Avis cannot be held liable for these incidents unless it operated the LAX facility for purposes of title III of the ADA during the relevant time period.[7] The parties are in agreement that this question must be resolved by reference to the terms of the LAX Licensing Agreement.

The LAX Licensing Agreement provides that Avis is the owner of a

plan or system for conducting the business of renting passenger motor vehicles ... [which] consists, among other things, of uniform methods of operation, accounting, advertising service and publicity, courtesy and credit card service, kind and amount of insurance protection, ... style and character of equipment, furnishings and appliances used in the conduct of said business, methods of procuring business and referral of business, and the right to use the name "Avis", "Avis System" and "Avis Rent-A-Car System" . . . .

(Def.'s Br., Ex. A–7 [LAX Licensing Agreement at 1].) Paragraph 2 of the LAX Licensee Agreement provides that the licensee agrees to operate its rental car businesses "only in accordance with the methods, rules[,] and regulations of the [s]ystem as now constituted" by Avis, with Avis reserving "the right to change the [s]ystem and change or amend the methods, rules[,] and regulations of said [s]ystem" with proper notice. (*Id.*, Ex. A–7 [LAX Licensing Agreement at 2, ¶ 2].) In addition, the LAX Licensing Agreement

**6.** As discussed above, on the November 12, 1996, Dahlberg had a confirmed reservation for a vehicle, but experienced difficulties getting from the airport to the LAX facility because of a broken airport telephone and was further delayed because the hand control was found to be defective at a last-minute inspection. In the December 4, 1996, incident, Dahlberg again encountered broken airport telephones. After unsuccessfully attempting to flag down a shuttle bus, Dahlberg sought the assistance of an airport policeman to get a message to the LAX facility to send a shuttle for him. The first shuttle was not wheelchair accessible and, after some delay, an accessible shuttle was sent to pick up Dahlberg.

**7.** I note that, to the extent that Dahlberg seeks injunctive relief directing Avis to compel the LAX licensee to comply with the Settlement Agreement and the 1996 Amendment, that claim is mooted by the fact that the LAX facility was purchased by Avis and is now a corporate Avis location. (Def.'s Br., Statement of Undisputed Material Facts ¶ 29; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 29.)

requires the licensee to comply with all applicable laws and regulations and all directives and instructions contained in Avis' operations manual. (*Id.,* Ex. A–7 [LAX Licensing Agreement at 3, ¶ 3.7].) Avis furthermore "expressly reserves the right to change when and as it chooses, the [s]ystem or any part thereof, including any forms, bulletins, procedures, or standard Rental Agreements . . . ." (*Id.,* Ex. A–7 [LAX Licensing Agreement at 6, ¶ 8].) Finally, Avis had the right to terminate the LAX Licensing Agreement after one year.[8] (*Id.,* Ex. A–7 [LAX Licensing Agreement at 7, ¶ 14].) Dahlberg contends that these terms of the agreement gave Avis "the right to control its licensee's actions with respect to compliance with all laws and procedures, specifically including the ADA." (Pl.'s Resp. at 27.)

In *Neff v. American Dairy Queen Corp.,* 58 F.3d 1063, 1066 (5th Cir.1995), the Fifth Circuit addressed the issue of when a franchisor may be regarded as possessing such a degree of control over a franchisee as to be regarded as operating franchise for purposes of title III of the ADA. In that case, a disabled plaintiff sued defendant American Dairy Queen Corporation ("ADQ"), seeking an injunction requiring ADQ to modify stores owned by franchisees under franchise agreements with ADQ. *Id.* at 1064. ADQ moved for summary judgment on the plaintiff's claims, contending that its franchise agreements with the franchisees established as a matter of law that ADQ did not possess sufficient control over the franchisees that ADQ could have been said to have operated the franchised locations in which the plaintiff sought modification. *Id.* The franchise agreement in *Neff* provided that: (1) the franchisor could veto proposed modifications to the franchise's building and equipment; (2) the franchisor could set building maintenance standards; and (3) the franchisee would comply with the franchisor's operations manual. *Id.* at 1067–68.

Because the ADA does not define the term "operates," the court considered various dictionary definitions of the term. *Id.* The court noted that to "operate" in the context of a business operation means " 'to put or keep in operation,' '[t]o control or direct the functioning of,' or '[t]o conduct the affairs of; manage' . . . ." (*Id.* [quoting The Random House College Dictionary 931 (Rev.ed.1980); Webster's II: New Riverside Univ. Dictionary 823 (1988); The American Heritage Dictionary 1268 (3d ed.1992) ] ). Applying these definitions, the Fifth Circuit concluded that the relevant inquiry in determining whether a franchisor "operates" a franchisee's facilities for purposes of title III of the ADA is whether the franchisor "specifically controls the modification of the franchises to improve their accessibility to the disabled." *Neff,* 58 F.3d at 1066. This inquiry is determined with reference to the terms of the licensing or franchise agreement. *Id.* at 1066–67. Considering the provisions of the franchise agreement, the court concluded that, while the franchise agreement gave the franchisor the right to set standards for building and equipment maintenance and to veto proposed structure changes, these provisions in the franchise agreement were insufficient to support a holding that the franchisor operated the franchisee's store in the "ordinary and natural meaning of that term . . . ." *Id.* The court held that the fact that a franchisor has control over non-structural aspects of operations, such as accounting, uniforms, and trademarks, does not bear on the question of whether the franchisor or licensor operates a franchise for purposes of liability under title III of the ADA unless the ability to control these aspects of operations do not relate to the discriminatory conditions which exist at a franchise. *Id.*

■ My reading of the LAX Licensing Agreement satisfies me that this agreement did not confer on Avis a sufficient amount of control to make Avis the opera-

---

**8.** The licensee also had the right to terminate the LAX Licensing Agreement at any time after one year elapsed. (*Id.,* Ex. A–7 [LAX Licensing Agreement at 7, ¶ 14].)

tor of the LAX facility in the ordinary sense in which that word is used. Rather, the LAX Licensing Agreement gives the licensee the right to use Avis' system of renting cars—such as its uniform methods of operation and accounting and advertising services—and Avis' trademarks and trade dress. (Def.'s Br., Ex. A–7 [LAX Licensing Agreement].) The LAX Licensing Agreement did not give Avis any sort of control over the operations of the licensee in any day-to-day fashion, nor did it give Avis the power to direct operations as pertains to the allegedly discriminatory conditions at the LAX facility—namely, the broken airport telephones, inaccessible shuttle bus, and the eleventh-hour inspection of the Kroepke hand control. Indeed, unlike the agreement before *Neff* court, the LAX Licensing Agreement does not appear to give Avis any control whatsoever over the LAX facilities or equipment or aspects of building maintenance. Thus, the LAX Licensing Agreement gives Avis even less authority over the day-to-day operations than did the franchise agreement at issue before the *Neff* court.

In addition, I note that, in arriving at the Settlement Agreement and the 1996 Amendment thereto, the Justice Department appears to have concluded that Avis did not "operate" its licensees within the meaning of title III of the ADA. The Settlement Agreement provides that Avis shall "*notify* all current Licensees of the rental policies described in [the Settlement Agreement] and shall *urge* current Licensees to adopt such policies." (Def.'s Br., Ex. A—4 [Settlement Agreement ¶ 13 (emphasis supplied)].) The Settlement Agreement further provided that Avis would require new licensees and existing licensees renewing licensing agreements on or after the effective date of the Settlement Agreement to adopt the policies set forth in the Settlement Agreement. (*Id.*, Ex. A—4 [Settlement Agreement ¶ 14].) The 1996 Amendment contains language to the effect that Avis would require new licensees and existing licensees renewing licensing agreements to adopt to provisions of the Settlement Agreement, as well

as a provision requiring Avis to notify Avis licensees of the terms of the 1996 Amendment and "encourage" the licensees to adopt procedures. (*Id.*, Ex. A—4 [1996 Amendment ¶¶ 7(f), (m) ].) The inclusion of language in the Settlement Agreement and the 1996 Amendment directing Avis to "urge" and "encourage" its licensees to adopt the policies of these agreements suggests that the parties to these agreements did not think Avis had the authority under the licensing agreement to compel its licensees to do so. While the Justice Department's interpretation of Avis' ability to direct its licensees operations under Avis' licensing agreements is not determinative of the issue, the fact that the Justice Department interpreted the agreements in such a way bolsters my conclusion that Avis did not operate the LAX facility during the relevant time period for purposes of title III of the ADA.

Subsequent to the completion of the briefing on Avis' summary-judgment motion. Dahlberg sought to introduce supplemental exhibits which, he contends, establish that Avis did, in fact, operate the LAX facility within the meaning of title III of the ADA. Specifically, Dahlberg submitted documents related to a declaratory judgment action in which Avis was a plaintiff brought before the United States District Court for the Eastern District of New York. (Pl.'s Supplemental Exs. and Authority in Resp. to Def.'s Mot. for Summ. J. [filed Nov. 15, 1999]; Mot. to Correct Ex. Numbers in Pl.'s Supplemental Exs. and Authority in Resp. to Def.'s Mot. for Summ J. [filed Dec. 21, 1999] [hereinafter "Pl.'s Supplemental Br.' and Corrected Exs."].) In *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25 (2d Cir.1996), Avis brought a declaratory judgment action against various of its licensees seeking an interpretation of its licensing agreements. In July 1995, Avis had informed its licensees of its intention to enter the replacement car rental market by acquiring Agency Rent a Car. *Id.* at 29. Several licensees, contending that Avis' acquisition and operation of Agency Rent a

Car locations within the licensees' territories would violate that licensees' contractual rights to exclusive territories, threatened litigation for breach of the licensing agreements, and Avis brought a declaratory judgment action to interpret the licensing agreements at issue and determine whether Avis' purchase and operation of Agency Rent a Car would violate those agreements. *Id.* The district court dismissed the suit for lack of subject matter jurisdiction, concluding that while the licensees transacted business in New York, the declaratory judgment claim did not arise out of those transactions and, thus, New York's long-arm jurisdiction statute did not confer jurisdiction as to the out-of-state licensees. *Id.* at 30. The Second Circuit reversed, concluding that New York's long-arm statute did confer jurisdiction on the district court.<sup></sup> *Id.*

Rather than relying on the Second Circuit's opinion, which did not reach the issue of the construction of the licensing agreements at issue in that case. Dahlberg relies on certain statements contained in Avis' briefing before the Second Circuit. (Pl.'s Supplemental Br. and Corrected Exs. at 2.) Dahlberg specifically relies on one statement contained in Avis' appellate brief and two statements contained in its reply brief. (*Id.* at 2—3.) In the appellate brief, Avis stated that:

> For the Avis System to function efficiently, its business must be defined, standardized, centralized and monitored at and from its Garden City[, New Jersey] home base pursuant to the License Agreement under which the Licensees perform. To remain part of and continue to profit from the Avis System, the Licensees agree in the License Agreement to many continuing, beneficial and wide-reaching business contacts with [Avis] in New York, the scope of which essentially defines their entire business operations . . . .

(*Id.*, Ex. D—34 [Avis' Appellate Br. at 8 (filed in Second Circuit Court of Appeals Mar. 27, 1996)].) In its reply brief, Avis stated:

> Every one of the reservations and rentals for . . . vehicles [rented from a licensee] made other than in person is made through the Wizard computer system in New York . . . . The result is the same: [licensees] are electronically linked to, voluntarily dependent on and derive and process virtually all of their business through this New York-based computer with which they communicated and do business every day.

(*Id.*, Ex. D—35 [Avis Appellate Reply Br. at 5 (filed in Second Circuit Court of Appeals May 10, 1996)].) Avis further stated in its reply brief that, under the licensing agreements, a licensee's business must be conducted in compliance with all bulletins and instructions contained in the Avis system operations manual and other directions issued by Avis. (*Id.*, Ex. D—35 [Avis Appellate Reply Br. at 5 (filed in Second Circuit Court of Appeals May 10, 1996)].) Dahlberg contends that these statements in Avis' filings before the Second Circuit are inconsistent with the position which Avis has taken regarding the degree of operational control which it held over the LAX licensee during the relevant time period and that these statements create an issue of fact regarding the degree of operational control which Avis held over the LAX licensee.

I disagree. The first two statements on which Dahlberg relies demonstrate that Avis contended before the Second Circuit that it controlled the Wizard system. That Avis controls the Wizard system is not in dispute here and Dahlberg's argument merely represents one more example of his repeated attempts to conflate Avis' control over the Wizard system into day-to-day operation of the LAX facility. The third statement on which Dahlberg relies, regarding a licensee's obligations to conform to Avis' operations manual and directives, is also not inconsistent with the position which Avis has taken in this litigation. Indeed, I have already found that it does not follow that Avis controlled the day-to-day operations of the LAX facility from the proposition that Avis licensees

contractually agree to abide by the operations manual and directives.

Based on the foregoing, I find that Avis did not operate the LAX facility for purposes of title III of the ADA as a matter of law during the relevant time period. Under the LAX Licensing Agreement, Avis had no control whatsoever over those conditions at the LAX facility which Dahlberg contends resulted in discrimination against him. Accordingly, Avis is entitled to summary judgment on Dahlberg's first claim to the extent that his claim is predicated upon the evidence occurring at the LAX facility in late 1996.

### b. Full and Equal Enjoyment

Avis next contends that the incidents of which Dahlberg complains — the one-day delay he experienced obtaining a convertible in January 1997, Avis' refusal to equip a convertible with a hand control in Miami in April 1997, and the March 1999, delay in obtaining a luxury vehicle — are examples of inconveniences which all car renters experience, rather than incidents of disability discrimination. (Def.'s Br. at 21—23.) Given the parties' disputes over these incidents, I conclude that Dahlberg has raised questions of fact as to whether these incidents amount to disability discrimination. Accordingly, Avis is not entitled to summary judgment on this basis.

### c. Reasonable Modifications

#### i. Analytical Framework and Burdens of Proof

While no Tenth Circuit case has addressed the analytical framework or burdens of proof in a case brought pursuant to title III of the ADA, several courts outside of the Tenth Circuit have imported the analytical framework employed in cases decided under title I of the ADA, which prohibits disability discrimination in employment, into the title III context.[9]

See, e.g., Johnson v. Gambrinus Co./ Spoetzl Brewery, 116 F.3d 1052 (5th Cir. 1997) (discussing analytical framework and burdens of proof in "reasonable modifications" case under 42 U.S.C.A. § 12182[b][2][A][ii] and importing title I framework and burdens of proof); Staron v. McDonald's Corp., 51 F.3d 353 (2d Cir. 1995) (same); Matthews v. The National Collegiate Athletic Ass'n, 79 F.Supp.2d 1199 (E.D.Wash.1999) (same); Olinger v. United States Golf Ass'n, 55 F.Supp.2d 926 (N.D.Ind.1999) (same), aff'd 205 F.3d 1001 (7th Cir.2000); Martin v. PGA Tour, Inc., 994 F.Supp. 1242 (D.Or.1998) (same), aff'd 204 F.3d 994 (9th Cir.2000). This approach is both sensible and supported by the statutory language of both titles I and III of the ADA. Indeed, the language of the salient provisions of titles I and III of the ADA is quite similar. Title I of the ADA defines discrimination to include "not making reasonable accommodations ... unless [the defendant] can demonstrate that the accommodation would impose undue hardship." 42 U.S.C.A. § 12112(b)(5)(A) (emphasis supplied). As noted above, title III defines discrimination to include "a failure to make reasonable modifications ... unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the public accommodation]." Id. § 12182(b)(2)(A)(ii) (emphasis supplied). Thus, there appears to be little, if any, substantive difference between the "reasonable accommodation" which title I requires and the "reasonable modification" which title III mandates. While title I provides an undue hardship defense and title III provides a fundamental alteration defense, "fundamental alteration is merely a particular type of undue hardship," and, consequently, the scope of the fundamental alteration defense is more narrow. Johnson, 116 F.3d at 1059 (citing 29 C.F.R. pt.

---

9. The same analytical framework and allocation of burdens of proof have also been employed by numerous courts in the context of removal of architectural barriers under title III. See, e.g., Pascuiti v. New York Yankees, 1999 WL 1102748 (S.D.N.Y. Dec.6, 1999) (addressing burdens of proof in context of removal of architectural barriers under 42 U.S.C.A. § 12182[b][2][A][iv]); Lieber v. Macy's West, Inc., 80 F.Supp.2d 1065 (N.D.Cal.1999); Guzman v. Denny's, Inc., 40 F.Supp.2d 930 (S.D.Ohio 1999) (same).

1630, § 1630.29(p) ). Accordingly, I shall adopt the *Johnson* court's approach and employ the allocation of burdens of proof and analytical framework which have developed in the context of title I jurisprudence.

■ Under the burden-shifting analysis which the *Johnson* court imported from the title I context, the plaintiff in a title III case has the burden of proving that a modification was requested and that the requested modification is reasonable. *Id.* at 1059. The plaintiff meets this burden by "introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases." *Id.* The defendant may then introduce evidence "indicating that the plaintiff's requested modification is not reasonable in the run of cases ......" *Id.* The plaintiff bears the ultimate burden of proof on the issue of reasonableness. *Id.* If the plaintiff meets this burden, then the defendant must make the requested modification unless the defendant pleads and meets the burden of proving that the plaintiff's requested modification would fundamentally alter the nature of the public accommodation. *Id.* "The type of evidence which satisfies this burden focuses on the specifics of the plaintiff's or defendant's circumstances, and not on the general nature of the accommodation." *Id.* at 1059–60. Thus, the ultimate question is whether making the plaintiff's proposed modification, given his or her individualized circumstances, would fundamentally alter the

defendant's service.[10] *Id.* at 1060. *See also Martin*, 994 F.Supp. at 1248—49 (adopting and employing *Johnson*'s analysis).

### ii. Application to Dahlberg's Claim

Because the contours of the injunctive relief which Dahlberg seeks pursuant to title III of the ADA were unclear from his briefing, I sought clarification from Dahlberg at a hearing on Avis' summary judgment motion held January 28, 2000. At that hearing, Dahlberg's counsel stated that Dahlberg sought an order directing Avis to comply with the Settlement Agreement and the 1996 Amendment. In addition, counsel also represented that the following aspects of Avis' service or how Avis provides its service discriminate against disabled customers: (1) Avis' method of processing reservations for disabled customers; (2) Avis' use of the outside reservations systems, such as United Air Lines' Apollo system; (3) categories of cars which are not routinely made available to disabled customers, specifically sport utility vehicles ("SUVs"); and (4) the inability of disabled customers to participate in Avis' incentive programs. I consider each item separately.

### (1) Order Compelling Avis to Comply with the Settlement Agreement and the 1996 Amendment

■ Dahlberg first seeks an order directing Avis to comply with the Settlement Agreement and the 1996 Amendment thereto.[11] "Under settled principles of

---

**10.** Like the courts of the Fifth Circuit, courts in the Tenth Circuit employ a burden-shifting analysis to determine whether an accommodation is reasonable in title I cases. *See White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir.1995). Once the plaintiff produces evidence "sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate." *Id.* (citations omitted). If the employer presents evidence of its inability to accommodate, the plaintiff " 'has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evi-

dence.' " *Id.* (quoting *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 308 (5th Cir. 1981)). The plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of discrimination based upon his disability. *Id.* (citations omitted).

**11.** I note that Dahlberg contended in his second claim, which I dismissed in open court at a hearing on April 23, 1999, that Avis' alleged breach of the Settlement Agreement and the 1996 Amendment was a violation of the ADA. (*Courtroom Mins.* [filed Apr. 23, 1999].) Dahlberg's third claim, which I also dismissed, asserted a claim for breach of con-

federal common law, the third party may have enforceable rights under a contract if the contract was made for his direct benefit." *Holbrook v. Pitt,* 643 F.2d 1261, 1270 (7th Cir.1981). Where, however, the Government enters a consent decree for the benefit of third parties in a general sense, enforcement of the consent decree generally is limited to the contracting parties because in such circumstances the numerous third-party beneficiaries are assumed to be merely incidental beneficiaries without rights of enforcement. *See Rafferty v. NYNEX, Corp.,* 60 F.3d 844, 849 (D.C.Cir. 1995) ("Unless a government consent decree stipulates that it may be enforced by a third party beneficiary, only the parties to the decree can seek enforcement of it."); *Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280, 288 (D.C.Cir.1993) ("Even if the government intended its consent decree to benefit a third party, that party could not enforce it unless the decree so provided."); Restatement (Second) of Contracts § 313(2) cmt. a (1981) ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested."); *Hook v. State of Ariz., Dep't of Corrections,* 972 F.2d 1012, 1015 (9th Cir.1992) (holding third-party beneficiaries of Government contract are assumed to be incidental beneficiaries and are precluded from enforcing it absent a clear intent to the contrary); *Hodges by Hodges v. Public Bldg. Comm'n of Chicago,* 864 F.Supp. 1493, 1509 (N.D.Ill.1994) (same). The similarly well-established corollary to this rule is that incidental beneficiaries to a consent decree lack standing to enforce it. *Wang v. Gordon,* 715 F.2d 1187, 1190 (7th Cir.1983); *Moore v. Tangipahoa Parish Sch. Bd.,* 625 F.2d 33, 34 (5th Cir.1980); *Cicirello v. New York Tel. Co.,* 123 F.R.D. 523, 526 (E.D.Pa.1989) (denying standing to incidental beneficiary where government consent decree did not contemplate non-party enforcement), *aff'd,* 879 F.2d 855 (3d Cir.1989).

tract against Avis' for its alleged breach of the Settlement Agreement and the 1996 Amend-

In this case, it is undisputed that Dahlberg was not a party to either the Settlement Agreement or the 1996 Amendment. In addition, Dahlberg has not pointed to any language in either document which expresses or implies that Avis and the Justice Department intended that beneficiaries of the Settlement Agreement and the 1996 Amendment could bring an action to enforce either document. The Settlement Agreement provides that, in consideration for Avis entering into the Settlement Agreement, the Justice Department would not initiate further investigation and would refrain from commencing a civil action against Avis. (Def.'s Br., Ex. A—4 [Settlement Agreement ¶ 16].) The 1996 Amendment also contains this language. (*Id.,* Ex. A—4 [1996 Amendment ¶ 9].) In addition, the Settlement Agreement reserves to the Justice Department the right to review Avis' compliance with the Settlement Agreement and initiate a civil action if the Justice Department determines that Avis has violated the Settlement Agreement. (*Id.,* Ex. A—4 [Settlement Agreement ¶ 17].) These provisions clearly suggest that the parties intended for the Justice Department to retain for itself the duty of ongoing supervision and enforcement of the Settlement Agreement and the 1996 Amendment, and did not intend for the beneficiaries of the Settlement Agreement and the 1996 Amendment to have that ability. Accordingly, I conclude that Dahlberg lacks standing to obtain an injunctive order from this court directing Avis to comply with the Settlement Agreement and the 1996 Amendment thereto as an injunctive remedy to his first claim under title III of the ADA.

### (2) *Avis' Reservation System*

Dahlberg also contends that Avis' process for handling reservations for those disabled customers requiring hand controls deprives such customers of the full and equal enjoyment of Avis' services. (Pl.'s

ment as an intended third-party beneficiary of these agreements. (*Id.*)

Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.) As discussed above, Avis channels all such requests to Coles, its disability services coordinator, who then determines whether the vehicle and hand controls for that vehicle are available at the requested time and location and, if so, confirms the reservation for the customer. Because Cole must determine whether a vehicle and a hand control for that vehicle are available under Avis' system as it currently exists, a customer requesting a hand control does not immediately obtain a confirmed reservation. In contrast, non-disabled customers are able to obtain immediate confirmation of a reservation if the class of vehicle which the customer seeks to rent is available at the particular location at the specified time.

As a starting point, I note that Avis' procedure for handling requests for hand-controlled vehicles was put in place pursuant to the 1996 Amendment and that the Justice Department has concluded that this policy represents a reasonable modification to Avis' reservation process under title III of the ADA. While Dahlberg's title III claim is not a review of agency action under the Administrative Procedures Act and this court is not required to defer to the Justice Department's interpretation of the ADA, the court nonetheless finds significant the fact that the Justice Department, which is the agency primarily charged with implementation and enforcement of title III of the ADA, has found that Avis' process complies with the statute. In other words, while the Justice Department's blessing of these procedures is not dispositive, it is highly suggestive that these procedures are, in fact, reasonable modifications to Avis' method of providing its services in order to accommodate disabled customers.

█ Dahlberg is nevertheless unhappy with the manner in which Avis processes reservations for hand-controlled vehicles, although he fails to suggest any modifications — reasonable or otherwise — which would rectify the problem which he perceives. Rather, Dahlberg attempts to deflect his burden of suggesting a reasonable modification onto Avis by contending that Avis is asking this court to conclude as a matter of law that Avis cannot process reservations for hand-controlled vehicles through the Wizard system in the same manner as other reservations. (Pl.'s Third Mot. to File Supplement Exs. in Resp. to Def.'s Mot. for Summ. J. at 4 [filed Jan. 6, 2000] [hereinafter "Pl.'s Third Supplemental Br."].) There are two difficulties with Dahlberg's argument. First, Dahlberg misstates Avis' contention. Avis is actually contending that the modifications which it has made to its system for processing reservations for disabled customers are reasonable under title III, not that additional modifications to that process are impossible. More importantly, if the court were to accept Dahlberg's argument, the effect would be to foist onto Avis the burden of proving that there are no reasonable modifications which could be made to its reservations system thereby short circuiting the burden-shifting analysis for reasonable modifications cases. Under the burden-shifting analysis set forth above, *Dahlberg* bears the burden of proving that a modification was requested and that the requested modification is reasonable. *Johnson*, 116 F.3d at 1059. Dahlberg may satisfy this burden by "introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases." *Id.* Only after Dahlberg has made such a showing does the burden then shift to Avis to introduce evidence "indicating that the plaintiff's requested modification is not reasonable in the run of cases . . . ." *Id.* Dahlberg has neither suggested a modification to Avis' system for handling reservations of hand-controlled cars nor has he produced evidence that a modification would be reasonable in the run of cases. Accordingly, Avis is entitled to summary judgment as to Dahlberg's first claim to the extent that is predicated upon Avis' internal reservation system.

### (3) Avis' Use of Outside Reservations Systems

Dahlberg next contends that Avis' use of outside reservation systems, such as the Apollo system, results in discrimination because customers requiring hand controls are required to call Avis directly for such reservations. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.) Avis responds that it has no control over the design or operation of systems such as the Apollo system because these systems are designed, owned, and operated by other entities. (Def.'s Br., Statement of Undisputed Material Facts ¶ 16.) Dahlberg does not deny that systems such as the Apollo system are not designed, owned, and operated by Avis, but contends that Avis could (1) provide travel agents with instructions on using such systems, or (2) use something else. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.)

 Taking Dahlberg's proposed modifications in reverse order, I conclude that, to the extent that his suggestion that Avis "use something else" can even be viewed as a suggested modification, such a modification is unreasonable as a matter of law. Dahlberg fails to explain how excluding all Avis customers from making reservations through outlets such as the Apollo system would qualify as a reasonable modification in the run of cases. Accordingly, Avis is entitled to summary judgment to the extent that Dahlberg seeks an order of this court directing Avis to discontinue its use of outside reservations systems such as the Apollo system.

Dahlberg also appears to contend that Avis should provide travel agents with information on how to properly use the outside reservations systems to request reservations for hand-controlled vehicles. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.) Avis has produced evidence that it already provides information to travel agents regarding the proper use of air lines' reservations systems for reserving hand-controlled vehicles. For example, John Sellers. Avis' director of customer service, testified that Avis has a department within its reservations group called the "Save–Us–Avis Desk." (Def.'s Br., Ex. A—1 [Seller's Dep. at 202—05].) The employees in this department are trained on how to use the various airline reservations systems and, when a travel agent improperly books a reservation through such as system, these employees contact the travel agent personally and provide information and education on how to properly use the particular outside reservation system to book a reservation with Avis for a hand-controlled vehicle. (*Id.*, Ex. A—1 [Seller's Dep. at 203].) Dahlberg has not presented any evidence that he has requested any additional modifications or that such modifications would be reasonable in the run of cases. Because Dahlberg has failed to do so, Avis is entitled to summary judgment as to this aspect of Dahlberg's first claim.

Finally, Dahlberg takes issue with Avis' use of the outside reservations systems because Avis requires that the person seeking a reservation for a hand-controlled vehicle call Avis' directly to complete such a reservation. Because I have already concluded that Dahlberg has failed to suggest a modification to that system and offer evidence to support such a modification's reasonableness, I decline to revisit this argument in the context of the outside reservations systems here. Accordingly, Avis is entitled to summary judgment as Dahlberg's contentions regarding the outside reservations systems.

### (4) SUVs

Avis contends that Dahlberg lacks standing to seek an injunctive order directing Avis to equip vans, minivans, and SUVs with hand controls because it is undisputed that Dahlberg has no interest in renting a van from Avis and that he is unable to use a minivan or a SUV unless these vehicles are equipped with lifts. (Def.'s Br., Statement of Undisputed Material Facts ¶ 51; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 51.) Dahlberg contends, howev-

er, that "he has an interest in having Avis provide hand controls on such vehicles for other disabled customers." (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 51.)

■ The standing requirement is a prerequisite for federal court jurisdiction growing out of the "case or controversy" requirement of Article III of the United States Constitution. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) The Supreme Court has developed a three-part test for standing. The first prong of the test, which Avis' argument implicates, requires that "the plaintiff have suffered an 'injury in fact' ——an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136 [119 L.Ed.2d 351(1992)] ). Under the circumstances, I must conclude that Dahlberg does not have standing to seek an order from this court directing Avis to equip vans, minivans, and/or SUVs with hand controls for disabled renters because Dahlberg has provided no evidence that he has been injured by a failure to so equip such vehicles with hand controls in the past or that there is an actual or imminent risk that he will be so injured in the future. Accordingly, Avis is entitled to summary judgment on Dahlberg's claim to the extent that he seeks and order from this court directing Avis to equip vans, minivans, and/or SUVs with hand controls.

### (5) Incentives

■ At the hearing on January 28, 2000, Dahlberg's counsel also indicated that Dahlberg seeks some sort of an order regarding "incentives" which Avis provides to its customers. Upon further review of Dahlberg's brief in response to Avis' motion for summary judgment, I note that Dahlberg never mentions the issue of incentives which Avis allegedly withholds from disabled customers, much less pro-

vides citation to evidence in the record to support his claim that Avis discriminatorily withholds incentives from its disabled customer. Without a specific reference, the court is under no obligation to "search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1025 (10th Cir.1992); *see also Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1546 (10th Cir.1995) (holding that in order to withstand summary judgment, the non-movant must identify a genuine issue of material fact by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein and that a court need not search the record to find uncited evidence which controverts a material fact); *accord, United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs [and the record]."). It is not the obligation of this court to dig through the reams of paper which the parties have deposited before me in connection with this summary-judgment motion, particularly because Dahlberg did not consider the issue sufficiently important to raise it in his briefing. Accordingly, Avis is entitled to summary judgment to the extent that Dahlberg seeks an order from this court directing Avis to take action with respect to providing incentives to disabled customers.

### 3. State–Law Claims: Fourth, Fifth, Seventh, and Eighth Claims

■ Where a district court has dismissed all claims over which it has original jurisdiction, 28 U.S.C.A. § 1367(c)(3) expressly authorizes the court to decline to exercise supplemental jurisdiction over the remaining state-law claims. 28 U.S.C.A. § 1367(c)(3). Whether to exercise supplemental jurisdiction under such circumstances lies within the discretion of the court. *Medina v. City of Osawatomie,* 992 F.Supp. 1269, 1279 (D.Kan.1998). "Discretion to try state law claims in the absence of any federal claims should only be exer-

cised in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction. *Id.* (citing *Thatcher Enter. v. Cache [County] Corp.,* 902 F.2d 1472, 1478 [10th Cir. 1990] ). As a general rule, the balance of factors to be considered will point towards declining to exercise jurisdiction over state-law claims when the federal claims have been eliminated prior to trial. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988). Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enter.,* 902 F.2d at 1478.

In this case, the federal claims to which Dahlberg's state-law claims are supplemental has been resolved. I find that there exists no compelling reason to exercise supplemental jurisdiction and determine that interests of comity and federalism dictate that these claims be heard in state court. Accordingly, Dahlberg's state-law claims are dismissed without prejudice.

### 4. Conclusion

Based on the foregoing it is therefore ORDERED as follows:

1. The Eastern Paralyzed Veteran Association motion for leave to file brief as *amicus curiae* (# 50) is GRANTED.

2. Dahlberg's October 26, 1999, motion to filed supplemental authority (# 88) is GRANTED.

3. The National Spinal Cord Injury Association's motion for leave to file brief as *amicus curiae* (# 91) is GRANTED.

4. Dahlberg's November 15, 1999, motion for permission to submit supplemental exhibits and authority (# 92) is GRANTED.

5. Dahlberg's December 21, 1999, motion for leave to substitute corrected supplemental exhibits is GRANTED.

6. Dahlberg's January 6, 2000, third motion to file supplemental exhibits is GRANTED.

7. Avis motion for summary judgment is GRANTED. This case is hereby DISMISSED and defendant shall have its costs.